[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11498
_____

D.C. Docket No. 3:12-cv-00152-TCB

CHARLES FLOWERS,

                                        Plaintiff - Appellant,

versus

TROUP COUNTY, GEORGIA, SCHOOL DISTRICT,
DR. COLE PUGH,
individually and in his official capacity as Superintendent
of the Troup County School District,
JOHN RADCLIFFE,
individually and in his official capacity as Assistant
Superintendent of the Troup County School District,
TED ALFORD,
individually and in his capacity as a member of the
Board of Education of Troup County,
DEBBIE BURDETTE,
individually and in her capacity as a member of the
Board of Education of Troup County, Georgia, et al.,

                                        Defendants - Appellees,

REV. ALLEN SIMPSON,

individually and in his capacity as a member of
the Board of Education of Troup County, Georgia,

                                                                Defendant.

                        _____

                     Appeal from the United States District Court
                          for the Northern District of Georgia
                        _____

                              (October 16, 2015)


Before TJOFLAT and JILL PRYOR, Circuit Judges, and MOODY,[*] District
Judge.

TJOFLAT, Circuit Judge:

        Employers covered by Title VII of the Civil Rights Act of 1964 may not

"fail or refuse to hire or … discharge any individual, or otherwise … discriminate

against any individual … because of such individual's race."   42 U.S.C. § 2000e-

2(a)(1).  Charles Flowers is the former head football coach of Troup High School

in Troup County, Georgia.  Following his termination from that position, Flowers

brought suit against the Troup County School District under Title VII and related

federal laws that outlaw racially discriminatory employment decisions.  The

School District argues that it fired Flowers because Flowers committed recruiting

---

[*] The Honorable James S. Moody, Jr., United States District Judge for the Middle District
of Florida, sitting by designation.

2

violations that resulted in ineligible students being enrolled at Troup High School to play football. Flowers denies any wrongdoing and claims that the School District singled him out for special treatment under the pretext of investigating alleged recruiting violations. The parties fiercely dispute the existence of, and meaning to be drawn from, many of the ins and outs of the events leading to and following Flowers's termination.

Although the voluminous record before us is admittedly complex, the conclusion to be drawn from it is simple. Title VII functions only as a bulwark against unlawful discrimination; it does not substitute the business judgment of federal courts for any other nondiscriminatory reason. Flowers, though he has produced sufficient evidence that could lead a reasonable jury to infer that he was treated unfairly,[1] has failed to produce any evidence suggesting that his treatment was on account of his race. When we hack back the thicket of factual disputes and excise Flowers's conclusory allegations, we are left with nothing more than a routine disagreement between employer and employee. Any indication that racial discrimination informed the School District's decision to fire Flowers is

---

[1] Though Flowers might be able to assert state-law remedies for defamation or unlawful termination—an issue on which we express no opinion—Title VII provides him no succor.

conspicuously absent from the evidence presented.  We therefore affirm the

District Court's grant of summary judgment.[2]

## I.

## A.

At the end of 2009, Troup High School, part of Georgia's Troup County

School District, began its search for a new head football coach.  Both the school's

athletic director and the then-head coach reached out to Charles Flowers, an

alumnus of Troup High School.  Flowers had distinguished himself at Shaw High

School in Columbus, Georgia, winning multiple coach-of-the-year awards and

state championships in both baseball and football between 1987 and 2005.

Following his tenure at Shaw High School, Flowers served as the athletic director

---

[2] We pause briefly to highlight a matter that the District Court declined to rule on, but should have.  Precedent makes it abundantly clear that qualified immunity should have been granted to seven of the ten individual defendants, Troup County School District officials who were caught up in Flowers's trawl by their sheer proximity to the intended catch.  These officials—Troup County School Board members Ted Alford, Debbie Burdette, John Darden, Dianne Matthews, Alfred McNair, Sheila Rowe, and Rev. Allen Simpson—took discretionary actions approving the investigation into Flowers and his subsequent termination based, at least in part, on a nondiscriminatory reason:  the punishment of suspected recruiting violations.  There is nothing in the record to suggest that the board members were on actual or constructive notice that any of their actions could possibly be considered a violation of Flowers's constitutional rights.  *See, e.g.*, *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1282–85 (11th Cir. 2008); *see also Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (citing *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (quotation marks omitted)).

Nor does Flowers advance any evidence suggesting that the board members acted in anything but good faith at all times.  Indeed, their involvement is only tangentially related to the events at the heart of Flowers's case.  Allowing the board members to remain in the proceedings, then, exposes these individuals to exactly the sort of burdensome costs that qualified-immunity doctrine is designed to eliminate.

of the Muscogee County School District for a year and a half and then became the head football coach of the Dougherty Comprehensive High School in Albany, Georgia.    The Troup County School District's Board of Education extended to Flowers an at-will one-year contract on August 1, 2010, making Flowers the first black head football coach in Troup County since the School District had been racially desegregated in 1973.  Despite having retired from teaching in 2010, Flowers agreed to coach Troup High School's football team as a part-time, "49% employee."  This arrangement allowed Flowers to coach football while receiving his retirement benefits.

Seven months before he was officially hired, Flowers began holding workouts and practices while administrators subjected him to an unusually intensive background check, with a particular focus on discovering any potential recruiting violations.  After that investigation came up empty, Troup County School District confirmed Flowers's employment.  In subsequent contracts, Flowers also became the Defensive Coordinator of the football team, Events Coordinator, and Department Chair of Health and Physical Education.  The School District later offered Flowers a second year-long employment contract, which provided that Flowers would also serve as Assistant Athletic Director.

After hiring Flowers, the School District's administrators decided that they needed to update the School District's policies regarding athletic eligibility and

5

improper recruiting.  On August 19, the School Board took "swift action" to adopt a new "Competitive Interscholastic Activities Policy," which came to be known as the "Charles Flowers Policy" as a result of allegations of recruiting violations made against Flowers.  Between August 5, 2010 and February 28, 2011, Troup County School District officials received seven letters from school officials in neighboring Lanett, Alabama, questioning eight students' eligibility to play for Troup High School.[3]  The first letter, sent by a Lanett City Schools attendance officer on August 5, 2010, declared that Lanett officials had "verified" that two Troup High School students and football players—Jalen and Zanquanarious Washington—lived in the Lanett City School District, and that Lanett officials were "in the process of verifying … the residence" of a third Troup High School student and football player.

The Washington brothers had previously attended Lanett High School, where they had also played football, before enrolling at Troup High School in 2010.  Concerned with her boys' educational opportunities in Lanett, Shayla Washington decided to enroll her sons Jalen and Zanquanarious Washington at Troup High School.  Shayla Washington's residential eligibility to do so, however,

---

[3] Lannett, Alabama and Troup County, Georgia abut one another roughly halfway along the Alabama–Georgia line.

became the subject of a months-long investigation by both Lanett and Troup County officials.[4]

Troup County Superintendent Cole Pugh, who assumed office on February 1, 2011, directed that an investigation be made into suspected recruiting violations committed by Flowers. On his first day of work, Superintendent Pugh met with the principal of Troup High School, who alleged that Pugh told him that Pugh "understood [Flowers] was a recruiter." Though the principal denied that Flowers was a recruiter, Pugh responded that he has "learned that where there's smoke, there's fire." Two months later, in April 2011, the Troup County School Board hired a private investigator, Duke Blackburn, who had been recommended by the Troup County Sheriff's Office, to look into the allegations of recruiting violations made against Flowers.

In his first report, sent on May 14, 2011, Blackburn originally stated that "any involvement of Troup County Staff" in efforts to falsify students' residencies was "unfounded." Blackburn then sent two follow-up emails after he learned in July 2011 that Shayla Washington and her children had been evicted from their

---

[4] Because the actual status of the Washington brothers' eligibility is irrelevant to whether the Troup County School District unlawfully discriminated against Flowers, we decline to recount the entire history of the investigation though we do note that the parties contest the details and conclusions of the investigation fiercely and at considerable length. As we are required to do in reviewing a disposition on summary judgment, we credit Flowers's contention that the Washington brothers were in fact eligible to enroll at Troup High School.

7

apartment in Troup County.  After speaking with the co-owner of that apartment, Ric Hunt, Blackburn reported that Shayla Washington's application had been denied because of her bad credit but that Flowers had intervened to guarantee the rent payments.  At no point in the investigation did Blackburn or any other Troup County School District official interview Shayla Washington directly.

On September 22, 2011, Superintendent Pugh and Assistant Superintendent of Operations John Radcliffe interviewed Ric Hunt, who again stated that Flowers had called on Shayla Washington's behalf and made rental payments to secure the apartment.  On January 19, 2012, Pugh and Radcliffe obtained a signed statement from Hunt to that effect.  Having waited several months until the end of the football season, Pugh met with Flowers and fired him on February 16, 2012.  Though Pugh had the authority as superintendent to fire Flowers on his own because of Flowers's status as a "49% employee," the Troup County School Board approved Pugh's decision to fire Flowers.

## B.

Six months after his termination, Flowers brought suit in the Northern District of Georgia claiming that the Troup County School District, and a host of school officials in both their official capacities and individually, discriminated against him on the basis of race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e; 42 U.S.C. §§ 1981 and 1983; and the Equal

8

Protection Clause of the Fourteenth Amendment to the United States Constitution.[5]

The District Court referred Flowers's case to a Magistrate Judge for report and recommendation. The Magistrate Judge, after a careful and in-depth review of both parties' accounts, concluded that summary judgment should be granted because Flowers had been unable to show that the School District's proffered reason for firing him—the School District's belief that Flowers had committed recruiting violations—was pretext for racial discrimination.

The District Court agreed with the Magistrate Judge's recommendation and granted summary judgment for the Troup County School District. After summarizing the series of events leading to Flowers being fired, the court analyzed all of Flowers's federal race-discrimination claims under Title VII's *McDonnell Douglas* burden-shifting framework, which is used in cases where the only evidence of unlawful discrimination is circumstantial. Under that familiar framework, a plaintiff first must establish a prima facie case of unlawful discrimination. If the plaintiff succeeds, a presumption of discrimination arises and the defendant then bears the burden of producing a legitimate,

---

[5] Not relevant here, Flowers also brought state-law tort claims of slander and intentional interference with contractual relations against Daves Nichols, the former chairman of the Troup County School Board, in Nichols's individual capacity. On summary judgment, the District Court held against Flowers on his federal race-discrimination claims and declined to exercise supplemental jurisdiction over the remaining state-law claims.

nondiscriminatory reason for its allegedly discriminatory action. Should the defendant put forth a reasonably clear legitimate, nondiscriminatory reason, all presumptions drop from the case and the plaintiff must prove, as a factual matter, that he suffered unlawful discrimination.

The Magistrate Judge concluded that Flowers had established a prima facie case of race discrimination and that the School District had advanced a legitimate, nondiscriminatory reason for firing Flowers. Neither party objected. The District Court then adopted these conclusions, noting that neither was "clearly erroneous." The sole issue before the District Court, as well as on appeal, is whether Flowers has produced enough evidence of pretext that would allow a reasonable jury to conclude that the School District fired Flowers because of his race.

Flowers made three objections to the Magistrate Judge's findings and conclusions on the issue of pretext. First, Flowers argued that "a genuine dispute exists about whether he actually committed a recruiting violation" because it is unsettled whether the Washington brothers or any of the other allegedly ineligible Troup High School football players were in fact ineligible. Second, Flowers argued that the School District's "reason for firing him is unworthy of credence" because Superintendent Pugh gave "inconsistent reasons for his termination." Third, Flowers argued that "two similarly situated comparators," white head

10

football coaches in Troup County also accused of recruiting violations, "were neither investigated nor disciplined."

The District Court considered, and rejected, all three of Flowers's objections. After correctly reciting the standard for summary judgment—that the moving party must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" when the evidence is viewed in the light most favorable to the nonmoving party, Fed. R. Civ. P. 56(a)— the court noted that Flowers could survive summary judgment by showing either (1) that the School District's "proffered reason is pretext and thus unworthy of credence," (2) that Flowers's "similarly situated comparators were treated more favorably," or (3) that there exists "a convincing mosaic of circumstantial evidence" that would allow a reasonable jury to conclude that Flowers was terminated because of his race. The District Court summarized Flowers's approach to showing pretext as a "three-front attack," and rejected each front in turn.

First, the court concluded that it was irrelevant whether Flowers had actually committed a recruiting violation. So long as "Pugh fired Flowers based on an honest belief that Flowers had violated the recruiting rules," merely proving that Pugh's belief was mistaken or unfounded does not show pretext, even if the belief is "dead wrong." Moreover, the court held that, though Flowers had advanced

11

factual disputes concerning the details of the meeting at which Pugh fired Flowers, those disputes were not material.  Specifically, Flowers asserted that he never admitted to making the call to Ric Hunt to guarantee Shayla Washington's rent and that Pugh provided inconsistent reasons for firing him.  Flowers alleged that Pugh initially told him that he had been fired for recruiting violations but Pugh later testified at a deposition that Pugh was unsure about whether Flowers's actions constituted recruiting until he contacted Ralph Swearngin, the Executive Director of the Georgia High School Association, after Pugh had already fired Flowers.[6]  The court expressed skepticism about the materiality of Pugh's after-the-fact decision to reach out to Swearngin and "merely … verify" Pugh's belief that Flowers had committed a recruiting violation.  In any event, the court concluded that Pugh's and Swearngin's statements were "not fundamentally inconsistent" and "do not create a jury question on the issue of pretext."

Second, the court rejected the comparators put forth by Flowers because it determined that they were not similarly situated.  Flowers directed the court's attention to Donnie Branch and Pete Wiggins, white head football coaches in

---

[6] The contents of the Pugh–Swearngin telephone conversation, but not its existence, are also disputed by the parties.  Regardless of the actual contents of that conversation, as with the many other factual disputes in this case, the critical issue remains that Flowers has failed to put forth any evidence that tends to show that the Troup County School District fired Flowers because of his race.

Troup County who had also been accused of recruiting violations. Branch allegedly had a meeting with an ineligible student at which Branch offered the student his choice of position and told the student that "[he] would be highly recruited if he played safety or outside linebacker." Wiggins allegedly provided an ineligible student with expensive equipment and cash payments of an undisclosed amount, as well as transportation to the student's residence, which was located outside of Troup County. The court reasoned that recruiting violations "can occur in myriad ways" and "fall along a spectrum" depending on their "nature and quality," including the magnitude of any "monetary value" received, the relative "likelihood of success," and "the risk of detection." Given that Flowers's alleged misconduct involved providing two students more than $1,500 of support, securing their physical presence to be able to enroll at Troup High School, and doing so in a manner especially likely to go undetected, the court held that Branch and Wiggins were not sufficiently similar comparators.

Finally, the court held that Flowers failed to establish "a convincing mosaic of circumstantial evidence" that would support a reasonable jury's inference that Flowers was the victim of racial discrimination. Noting that "most of the evidentiary tiles [Flowers] proffers" had already been "discarded as insufficient or irrelevant," the court determined that "[t]hese tiles cannot now be reassembled" to

13

create a mosaic of discriminatory intent. Simply put, "no reasonable jury could conclude that [Flowers] was fired because he is African-American."

The District Court granted summary judgment to the School District. Flowers appealed. We affirm.

## II.

We review the District Court's grant of summary judgment de novo. *Cook v. Bennett*, 792 F.3d 1294, 1298 (11th Cir. 2015). To do so, we view all evidence in the light most favorable to Flowers and draw all reasonable inferences in his favor. *Id.* Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute will preclude summary judgment if its resolution "might affect the outcome of the suit under the governing law" or "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

## III.

Title VII of the Civil Rights Act of 1964, in relevant part, forbids covered employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

14

individual's race."[7]  42 U.S.C. § 2000e-2(a)(1).  Employees who believe that they are the victims of racial discrimination may, of course, present direct evidence of that discrimination.  When direct evidence of unlawful discrimination is lacking, Title VII plaintiffs may instead turn to the burden-shifting framework set out in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

Under the well-trod *McDonnell Douglas* framework, a plaintiff first must make out a prima facie case of discrimination that "in effect creates a presumption that the employer unlawfully discriminated against the employee."  *Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094.  In race-discrimination cases, a plaintiff makes out a prima facie case when he shows by a preponderance of the evidence (1) that he is a member of a protected racial class, (2) that he was qualified for the position, (3) that he experienced an adverse employment action, and (4) that he was replaced by someone outside of his protected class or received less favorable treatment than a similarly situated person outside of his protected class.  *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas Corp.*,

---

[7] Though Flowers brought claims under the Fourteenth Amendment's Equal Protection Clause and 42 U.S.C. §§ 1981 and 1983 as well, their fates rise and fall with his Title VII claim. *See, e.g.*, *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1324–25 & n.14 (11th Cir. 2011).

411 U.S. at 802, 93 S. Ct. at 1824).  If the plaintiff can make this showing—which is "not onerous"—the establishment of a prima facie case creates a presumption that the employer discriminated against the plaintiff on the basis of race.  *Burdine*, 450 U.S. at 253–54, 101 S. Ct. at 1094.

At the time this presumption of discrimination arises, the burden then shifts to the employer to produce "a legitimate, nondiscriminatory reason" for the action taken against the plaintiff.  *Id.* at 254, 101 S. Ct. at 1094.  The employer's initial showing, just as the plaintiff's, is a low bar to hurdle.  The burden placed on the employer is only an evidentiary one:  a burden of production that "can involve no credibility assessment."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S. Ct. 2742, 2748, 125 L. Ed. 2d 407 (1993).  Once the employer advances its legitimate, nondiscriminatory reason, the plaintiff's prima facie case is rebutted and all presumptions drop from the case.  *Burdine*, 450 U.S. at 255, 101 S. Ct. at 1094–95.  Having "frame[d] the factual issue with sufficient clarity," the parties now "have a full and fair opportunity" to litigate whether the employer's proffered reason for its action is pretext.  *Id.* at 255–56, 101 S. Ct. at 1095.  At all times, the plaintiff retains "the ultimate burden of persuading the court that she has been the victim of intentional discrimination."  *Id.* at 256, 101 S. Ct. at 1095.

This burden-shifting analysis helps to filter out particularly obvious cases and works to frame more clearly the specific issues to be litigated.  It does not,

16

however, relieve Title VII plaintiffs of their burden to put forth evidence of discrimination on the basis of race. As we have made clear, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion" in Title VII cases. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). The critical decision that must be made is whether the plaintiff has "create[d] a triable issue concerning the employer's discriminatory intent." *Id.*

On appeal, Flowers questions only the District Court's failure to adopt his pretext arguments and reprises his three-front attack against the Troup County School District. First, Flowers claims that he never committed the alleged recruiting violations and that the investigation into his conduct was pretext because the School District knew Flowers to be innocent. Second, Flowers argues that the School District's shifting and inconsistent explanations for his firing support an inference of pretext. Third, Flowers asserts that he has identified sufficiently similar comparators to allow a jury to decide whether their disparate treatment turned on the basis of race. We face each front in turn.

## A.

First, Flowers claims to have put forth "abundant evidence" that the Troup County School District's investigation into him was pretext for his firing and that

17

the District "knew" Flowers had not committed any recruiting violations.  The
"abundant evidence" identified by Flowers is as follows:

- First, Troup County School District had not had a black head football coach
  before Flowers since the District was racially desegregated in 1973,
  performed an unusually intense background check on Flowers, and specially
  adopted "a detailed recruiting policy" in response to Flowers being hired.

- Second, when Superintendent Pugh assumed office after Flowers had been
  hired, Pugh continued to investigate Flowers based on "false allegations
  from Lanett, Alabama school officials" who "had a vested interest" in
  retaining the allegedly ineligible students "to play football at their high
  school."

- Third, Pugh neither ended the investigation into Flowers after the School
  District's investigation initially turned up nothing nor did he grant the
  private investigator's requests to question Shayla Washington and Flowers.

- Fourth, Pugh and Assistant Superintendent of Operations Radcliffe were
  aware of the investigation's flaws because both "have college degrees" and
  "years of experience in school administration and management."

- Fifth, Pugh "made no attempt to verify the information" provided by Ric Hunt, the co-owner of the apartment Flowers allegedly secured for the Washington family.

- Sixth, Flowers maintains that he would not have violated the School District's Competitive Interscholastic Activities Policy even if he had called Hunt and offered to pay the rent for the Washington family—allegations Flowers continues to dispute—because that policy applies only to recruiting efforts outside the District.

- Finally, at no time prior to the meeting at which he was fired did anyone from the School District speak with Flowers, which violated the District's policy of first giving warnings to employees under investigation.[8]

Flowers contends that, taken together, he has offered sufficient evidence of pretext to allow a reasonable jury to infer that the School District's true motivation was racially discriminatory. We disagree.

As a theoretical matter, could the School District's actual reason for firing Flowers have been that Flowers is black? Of course. Has Flowers produced any evidence, outside of his own conclusory say-so, that would support an inference of

---

[8] Whether the Troup County School District indeed had a general policy of giving at-will employees pretermination warnings, like so much of the record, is disputed. We, of course, resolve this factual uncertainty in Flowers's favor and assume that the District did have such a policy.

19

racial discrimination from the circumstances?  He has not.  In the light most favorable to Flowers, the evidence at most might support an inference that the School District's investigation into Flowers's potential recruiting violations may have been pretext of *something*.  The School District's ham-handed investigation and actions singling out Flowers could lead a reasonable jury to conclude that Pugh had it in for Flowers from the beginning.  But Flowers offers no evidence, after conducting extensive discovery and assembling a lengthy record, that the investigation was pretext of *discrimination on the basis of his race*.

As we have "repeatedly and emphatically held," employers "may terminate an employee for a good or bad reason without violating federal law."  *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).  Title VII does not allow federal courts to second-guess nondiscriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges.  We are not a "super-personnel department" assessing the prudence of routine employment decisions, "no matter how medieval," "high-handed," or "mistaken."  *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (quotation marks, citations, and alterations omitted).  Put frankly, employers are free to fire their employees for "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as

20

long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984).

There are virtually limitless possible nondiscriminatory reasons why the Troup County School District could have wanted to fire Flowers. Most obviously, the School District could have honestly believed that Flowers had committed recruiting violations. Or the School District, though not believing that Flowers had committed recruiting violations, could have wanted a football program free from the appearance of impropriety. Or the School District could have wanted to avoid an interstate kerfuffle with school officials in Lanett, Alabama. Or the School District could have wanted to make room for a new head coach—perhaps even a new coach who would be *more* willing to commit recruiting violations.[9] Or the School District could have simply grown tired of Flowers. We just don't know.

Because Flowers has the burden of persuasion on this point, it is his responsibility to advance sufficient evidence of racial discrimination to create a triable factual dispute. The only evidence that Flowers offers that even touches on his race is the fact that he became the first black head football coach in Troup County since 1973. Regardless of the unaddressed reality that the School District

---

[9] We have no reason to believe that the Troup County School District condones or encourages recruiting ineligible students to play football. We simply note that even if the School District were so disposed, Flowers's case would find no surer legal footing.

21

not only *hired* Flowers knowing of his race but also *rehired* him for a second year-long contract,[10] without more there is nothing to suggest a causal connection between his race and his termination.

### B.

Second, Flowers argues that the Troup County School District gave shifting and inconsistent reasons for firing him, and that these inconsistent reasons demonstrate pretext. We agree with the District Court's assessment that the alleged inconsistencies in the School District's explanation for firing Flowers—which concern what Pugh said to Flowers during their meeting on February 16, 2012, and whether Pugh changed his tune in the following weeks—are easily reconciled. Even if Pugh's purported explanation for his decision to fire Flowers had been a bald-faced lie, however, Flowers's claims would still fail to survive summary judgment.

At one time under this Circuit's law, Flowers could have gotten his claims before a jury after making a prima facie case and merely contradicting the School District's proffered legitimate, nondiscriminatory reason. *See Combs v. Plantation*

---

[10] The status of such "same actor" evidence remains unsettled in this Circuit. *See Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1442–43 (11th Cir. 1998). Because it is unnecessary to do so to resolve Flowers's case, we do not decide what, if any, adjudicative weight is due the School District's decisions to hire and rehire Flowers with the knowledge of his race.

22

*Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997), *recognized as modified*, *Chapman v. AI Transport*, 229 F.3d 1012, 1025 n.11 (11th Cir. 2000) (en banc).  Intervening precedent has since closed this avenue for Title VII plaintiffs.  Contradicting the School District's asserted reason alone, though doing so is highly suggestive of pretext, no longer supports an inference of unlawful discrimination.  "Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the [employer's] action was discriminatory." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000).  Allowing the plaintiff to survive summary judgment would be inappropriate, for example, if the record "conclusively revealed some other, nondiscriminatory reason" or the "plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.*; *see also Kagor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1307 (11th Cir. 2012) ("[A] contradiction of the employer's proffered reason for the termination of an employee is sometimes enough, *when combined with other evidence*, to allow a jury to find that the firing was the result of unlawful discrimination." (emphasis added)).

23

Because, as discussed above, Flowers has failed to put forth any additional evidence that would support an inference of unlawful discrimination, it is insufficient for Flowers merely to make a prima facie case and—assuming that he could do so—call into question the School District's proffered legitimate, nondiscriminatory reason.  The burden placed on Title VII plaintiffs to produce additional evidence suggesting discrimination after contradicting their employer's stated reasons is not great, but neither is it nothing.  Though we do not require the "'blindered recitation of a litany,'" we cannot "ignore the failure to present evidence of discrimination."  *Hawkins v. Ceco Corp.*, 883 F.2d 977, 984 (11th Cir. 1989) (quoting *Byrd v. Roadway Express, Inc.*, 687 F.2d 85, 86 (5th Cir. 1982)).

Flowers's challenge, then, fails on this score as well.

## C.

Finally, Flowers asserts that he has identified two similarly situated comparators whose more-favorable treatment could support a reasonable jury's inference that the Troup County School District's decision to fire him was pretext for race discrimination.  Flowers points to Donnie Branch and Pete Wiggins, the white head football coaches at the two other high schools in Troup County during Flowers's tenure at Troup High School.  Branch and Wiggins had both been flagged as recruiters in communications directed to School District officials for various alleged violations—including extending offers, making cash payments, and

24

providing transportation and expensive equipment to ineligible players—though neither Branch nor Wiggins had been investigated intensely or fired as a result.

In order to use comparators to support an inference of race discrimination in the context of workplace discipline, a plaintiff must show that the comparators' alleged misconduct is "nearly identical to the plaintiff's in order 'to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" *Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368–69 (11th Cir. 1999)). Though the comparators need not be the plaintiff's doppelgangers, the "nearly identical" standard requires much more than a showing of surface-level resemblance. Take, for example, our decision in *Burke-Fowler v. Orange County, Florida*, 447 F.3d 1319 (11th Cir. 2006). In *Burke-Fowler*, the plaintiff was a certified correctional officer who entered into a romantic relationship and married an inmate serving time at another correctional facility and was subsequently fired, allegedly for that reason. *Id.* at 1321–22. Believing her employer's reason to be pretext for discrimination based on her race, the plaintiff, who is black, brought suit and pointed to four white corrections officers who had also fraternized with inmates but went unpunished. *Id.* at 1322, 1324–25. Some of the comparators had romantic relationships with individuals who were subsequently incarcerated; others had post-incarceration relationships with inmates that were not romantic. *Id.* at

25

1325.  Despite their superficial similarity, we held that the plaintiff in *Burke-Fowler* had failed to establish valid comparators due to the "significant" differences in "type or degree of fraternization" because the plaintiff's misconduct was the only instance of officer–inmate fraternization that involved romance *and* that occurred after the inmate had been incarcerated.  *Id.*

The District Court identified three ways in which Flowers's and his comparators' alleged recruiting violations differed—the magnitude of any "monetary value," the likelihood of success of recruiting ineligible players, and "the risk of detection"—and noted that "Flowers's alleged misconduct could likely be distinguished in other ways as well."  We agree.  The most salient difference not discussed by the District Court is the intensity and frequency of the recruiting allegations leveled against Flowers.  Starting mere days after Flowers was first hired, Troup County School District officials received, over a period of roughly six months, seven letters from Lanett, Alabama school administrators questioning eight students' eligibility to play for Troup High School.  Flowers, in turn, points to the statements of the principal of Troup High School and two Troup High School students and football players, one of whom was Flowers's nephew, alerting Troup County officials to potential recruiting violations committed by Branch and Wiggins—all of which were made *only after* the investigation into Flowers had

26

begun.  The obvious differences between Flowers's circumstances and those of his purported comparators are hardly the stuff of an apples-to-apples comparison.

Moreover, Flowers's argument essentially boils down to quibbling about whether Branch's and Wiggins's alleged violations were *worse* than his own, not about whether they were *sufficiently similar*.[11]  On-the-ground determinations of the severity of different types of workplace misconduct and how best to deal with them are exactly the sort of judgments about which we defer to employers.  That Branch and Wiggins were treated differently, then, matters not.

## IV.

Accordingly, the District Court's decision to grant summary judgment is AFFIRMED.

AFFIRMED.

---

[11] Flowers disagrees with the District Court's judgment about the relative harms posed by his alleged recruiting violations compared to those of Branch and Wiggins.  Flowers asserts that his alleged violations concerned improper benefits of lesser monetary value, were less likely to succeed in securing commitments from ineligible players, and were more likely to result in Flowers's misconduct being discovered.  Precisely because reasonable minds can disagree on such matters, we leave their resolution to the discretion of employers.