[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-11265
Non-Argument Calendar
_____

D.C. Docket No. 1:13-cv-00873-SCJ


LILLIANNA A. STEVENS,

Plaintiff-Appellant,

versus

CITY OF FOREST PARK, GEORGIA,
DWAYNE HOBBS,
in his individual capacity,

Defendants-Appellees,

JOHN PARKER
in his individual capacity,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(December 22, 2015)

Before HULL, WILLIAM PRYOR and FAY, Circuit Judges.

PER CURIAM:

Plaintiff Lillianna Stevens is a Hispanic female and a former police captain who filed this suit against her former employer, the City of Forest Park, and Dwayne Hobbs, Chief of Police (collectively, "defendants") under Title VII of the Civil Rights Act of 1964, the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.[1]  Captain Stevens alleged that defendants discriminated against her based on her race and gender when Chief Hobbs issued her a Last Chance Agreement and the City later terminated her employment in September 2012.

Following discovery, defendants moved for summary judgment, arguing that they had terminated Stevens for failing to meet Chief Hobbs's reasonable expectations of her as a police captain.  Specifically, Stevens (1) had engaged in inappropriate sexual conduct and used racial language in the workplace; (2) had a pattern of inappropriate conflicts with officers; and (3) had attempted to inappropriately influence an accident review panel.  The magistrate judge recommended that the district court grant summary judgment to defendants, and the district court did so, adopting the magistrate judge's report and recommendation.

---

[1]Stevens also named City Manager John Parker, in his individual capacity, as a defendant in this action.  However, Parker was dismissed in October 2013 by stipulation of the parties.

2

Captain Stevens appeals, arguing that defendants' proffered legitimate reasons for their decisions were pretexts for discrimination. After review of the record and the parties' briefs, we affirm.

## I.  FACTUAL BACKGROUND

In 1992 plaintiff Captain Stevens joined the Forest Park Police Department and she was a captain when her employment ended in 2012. As captain, Stevens reported to Major Chris Matson, who ultimately reported to defendant Chief Hobbs. During her employment, Stevens was counseled and disciplined on several occasions for her conduct, language, and inability to get along with people.

Chief Hobbs is the Department's highest ranking member and is responsible for final recommendations to City Manager Parker concerning an employee's termination.[2]

## A.    Olascoaga Accident

The incident that directly precipitated plaintiff Captain Stevens's termination arose from a motor vehicle accident involving Officer Richie Olascoaga, one of Stevens's subordinates. On August 9, 2012, as Olascoaga was backing his patrol car into a spot between two buildings, he ran over another car's bumper lying on

---

[2]Technically, City Manager Parker made the decision to fire plaintiff; however, the record (construed in Stevens' favor) indicates that Chief Hobbs's recommendation to Parker drove that decision. Thus, we focus on Chief Hobbs's conduct.

the ground.  The bumper was three-to-four feet long, five-to-six inches wide and three-to-four inches high.  The bumper flipped up and scratched the patrol car.[3]

Sergeant David Eads was Olascoaga's supervisor.  When accidents occur, supervisors investigate and report to the watch commander (or deputy watch commander) on duty, who then assembles an "accident review packet" to help determine whether the accident is chargeable to the officer.  The review packet usually includes accident report forms, a statement of the officer involved, and pictures of the accident.  This review packet is given to the watch commander for the next shift or to the Criminal Investigations Division ("CID").  A panel of three officers independently reviews and assesses whether the accident is chargeable to the officer involved.  If the panel finds the accident is chargeable, disciplinary action may be taken against the officer.

According to Captain Stevens, despite the above process, review panels still often decide whether an accident is chargeable based solely on a verbal description of the accident and without a complete accident review packet.  Stevens stresses that no written protocol specifies how the Department conducts accident reviews like the one that followed Olascoaga's accident.

Following Officer Olascoaga's accident, Sergeant Eads responded to the scene to complete an accident report and take photographs.  Eads sent a picture of

---

[3]Upon reviewing photos of the accident, one witness in this case (Sergeant Terrell Cochran) testified that the object could technically be described as "the majority of [a] bumper."

the damage to the patrol car via text message to Lieutenant Jason Armstrong,[4] who notified Captain Stevens (the watch commander on duty) about the accident 10 to 15 minutes after it occurred.

Officer Olascoaga returned to the station and told Captain Stevens what had happened, and Stevens looked at the text picture of the damage to the vehicle. Stevens concluded that the accident was non-chargeable because Officer Olascoaga had not intended to hit the "piece of metal" and the accident was not preventable. Stevens did not inspect the vehicle or the "piece of metal" or review full-size photographs of the accident before reaching her conclusion.

Captain Stevens contacted Lieutenant James Delk of the CID unit to participate in the accident review panel, telling him that an officer had run over a "piece of metal" that flipped up and hit his vehicle and the accident was non-chargeable. Delk intimated that he did not want to conduct an accident review until all the necessary paperwork was completed.

Captain Stevens then approached Sergeant Terrell Cochran, Sergeant Raymond Daniel, and Patrol Officer Walter Randall to serve on the accident review panel. Stevens told Sergeant Cochran that Olascoaga had hit a "little piece of metal" and that the accident was non-chargeable. When Cochran asked what exactly was hit, Stevens responded that Olascoaga had hit a piece of metal "like a

---

[4]Armstrong is now a captain, but was a Lieutenant at all periods relevant to this case.

5

bumper" that was lying on the ground. According to Cochran, Stevens related this information loudly and "very fast."

Captain Stevens told Sergeant Daniel that Olascoaga hit an object, causing it to scratch his vehicle and the accident was non-chargeable. Stevens told Officer Randall that an officer had struck a "small metal item" while backing up his vehicle, resulting in a small scratch, and the accident was non-chargeable. Stevens did not provide any officers with photographs or any supporting documents. Based solely on Stevens's description of the accident, each officer signed the review panel's form determining the accident was non-chargeable.[5]

On the accident review form, Captain Stevens too indicated that she found the accident was non-chargeable. Stevens then asked Lieutenant Armstrong, her subordinate, to serve as a secondary reviewer. Armstrong then examined the documents in the review packet and the one text from Sergeant Eads. Armstrong found the accident was non-chargeable.[6]

---

[5]According to an August 13, 2012 note by Major Jamie Reynolds, Cochran reported feeling "intimidated" by Captain Stevens. However, it is unclear whether Chief Hobbs saw this note before deciding to present Stevens with the original or amended Last Chance Agreement. On August 27, 2012, Chief Hobbs responded to the note and inquired into Randall's reason for signing the form; on September 7, 2012, Randall responded that while he relied on the information provided by Captain Stevens (whom Randall stated could be "pushy"), he did not feel intimidated. In his deposition, Hobbs recalled that, at the time that he disciplined Stevens, he was aware that Randall had not felt intimidated by Stevens when she approached him about Olascoaga's accident.

[6]Armstrong later stated that while he felt the chargeability determination could "go either way," he found the accident non-chargeable because Stevens and the three accident review panel officers had made this finding. It is not clear from the record what documentation was in the

At approximately 4:00 pm, Major Matson asked Captain Stevens why he had not yet received the accident review packet, and Stevens responded that it was not yet complete. Shortly thereafter, Stevens delivered the packet to Matson without all of the photographs. Matson returned the packet to Stevens and asked where the remaining photographs were. Aside from the text photo, Sergeant Eads apparently had not yet transmitted the photos he took at the scene. After the other photographs were retrieved and downloaded, Matson reviewed them and concluded that the accident was avoidable and therefore chargeable. To Matson, the photographs showed that Olascoaga had backed over a car's bumper.

Major Matson returned the accident review packet to Lieutenant Armstrong, telling him that he and Captain Stevens should review the accident photographs and seriously rethink their conclusion. Armstrong understood Matson to be saying that the accident was chargeable and that Armstrong and Stevens should change their findings. Armstrong shared this understanding with Stevens.[7] Stevens responded that she was not going to change her non-chargeable decision. Armstrong likewise did not change his finding, later testifying that he did not want to contradict Stevens because he did not feel that he could change her mind. When

_____

packet at the time that Armstrong reviewed it aside from the form signed by Stevens and the panel officers.

[7]In her opening brief, Captain Stevens concedes that Matson told Armstrong that they had "made a serious error in judgment" and that they needed to "rethink whether [they] want[ed] to stand by [their] position or not," and states that Armstrong communicated this to Stevens.

7

Major Matson discovered that the officers had not changed their findings, Matson wrote at the bottom of the accident review form that he did "not concur with the assessment of this accident" because "[s]triking a stationary visible object is a chargeable accident."

Major Matson then spoke with the three officers on the panel, who reported that they had not been given pictures or documentation of the accident to review but rather had based their determination solely on Captain Stevens's verbal representations regarding the accident. Matson subsequently had a second panel of three officers review the accident review packet (including the photographs).[8] This panel unanimously concluded that Olascoaga's accident was chargeable.

The original panel members, Cochran, Randall and Daniel, received a light form of disciplinary counseling for making findings without reviewing pictures or documentation concerning the accident.[9] Armstrong did not receive any discipline for his role in the investigation.

Based on Captain Stevens's prior disciplinary history, Major Matson met with Chief Hobbs to determine what discipline Stevens would receive for her conduct in the accident investigation. While Major Matson initially proposed to

---

[8]Matson testified that a Captain Skwira assembled the second panel, and he gave no indication to Captain Skwira that a prior accident review was conducted.

[9]According to Matson, both Cochran and Randall were surprised when Matson showed them the photographs of the accident. Chief Hobbs testified in his deposition that two officers reconsidered their positions. Sergeant Cochran testified that the accident should have been found chargeable.

Chief Hobbs that Stevens be terminated, Hobbs ultimately decided to issue her a "Last Chance Agreement."  A Last Chance Agreements is the most severe sanction that a Forest Park Police Department employee can receive aside from immediate termination.

On August 13, 2012, Major Matson met with Captain Stevens to present the proposed Agreement.  The Agreement (1) placed Stevens on probation for 12 months and disqualified her from receiving pay increases, special assignments, or promotional opportunities; (2) revoked Stevens's part-time employment privileges until there was a "marked improvement in [her] behavior"; (3) required Stevens to "maintain a personal life that coincides with departmental policy and the Law Enforcement Code of Ethics"; (4) exposed Stevens to immediate termination for any future violation of any rule or regulation for the following 12 months; and (5) required Stevens to waive any right to appeal a subsequent decision to terminate her employment.  The Agreement stated that Stevens's rejection of any of its terms would result in her immediate termination.  According to Stevens, the Agreement was on pink paper and Matson condescendingly told her that he "thought that [she] would like the pink paper, since [she's] a girl and that's [her] favorite color."

Captain Stevens refused to sign the Agreement and left the meeting.  Chief Hobbs met with Stevens in an unsuccessful attempt to get her to sign the

9

Agreement.  Hobbs then gave Stevens additional time to think and made revisions to the Agreement.[10]

The revised Agreement summarized the basis for the disciplinary action and emphasized that Captain Stevens had attempted to improperly influence the first accident review panel.  The revised Agreement stated that the three officers on the first accident review panel described Stevens as "fast talking," "coercive" and "intimidating."  The Agreement stated that Stevens presented a "pre-ordained conclusion that the accident was non-chargeable" and led the panel to "blindly sign[] the report."  The Agreement also (1) stated that Stevens was "insensitive to the inherently intimidating impact that [her] rank may have on [her] subordinates and coworkers"; (2) cited Stevens's poor judgment in believing that the accident was non-chargeable; (3) criticized Stevens's failure to reconsider her decision after Matson suggested she do so; and (4) cited Stevens's unique disciplinary history, emphasizing several specific prior incidents.

The revised Agreement placed Captain Stevens on probation for 12 months, and required Stevens to agree to immediate termination if she acted in any way that was "overbearing" or "domineering" or that required "more than informal

---

[10]The record is unclear, and the parties disagree, about when Chief Hobbs revised the Agreement.  Captain Stevens claims that she was presented with both the original and revised Agreement on August 13; both versions of the Agreement are indeed dated August 13. Defendants argue that the Agreement was substantially rewritten following Hobbs's lengthy meeting with Stevens and a discussion with her counsel on August 14, consistent with Matson's and Hobbs's testimony.  We find this fact dispute immaterial to our analysis.

counseling." As before, the Agreement required Stevens to waive any right to appeal a subsequent termination decision.

Captain Stevens refused to sign the revised Agreement. Chief Hobbs recommended her termination to City Manager Parker, who signed off on Hobbs's recommendation, making Stevens's termination effective September 7, 2012. Lieutenant Armstrong was subsequently promoted to Acting Captain. Stevens exercised her right to appeal. On October 22, 2012, the day of her hearing, Stevens asked that she be allowed to resign. The City agreed, and she withdrew her appeal.

## B.    Prior Disciplinary Incidents Referenced in Last Chance Agreement

Because three prior incidents were recounted in the Last Chance Agreement and thus played a role in plaintiff Captain Stevens's ultimate termination, it serves to briefly summarize them.

First, in April 2010, Stevens was counseled for leaving her team without supervision at "quitting time."

Second, on February 23, 2012, Stevens was counseled and disciplined for an incident involving a Georgia Bureau of Investigation ("GBI") officer. The GBI officer was conducting a reference check of a former Forest Park police officer. Stevens advised the GBI officer that the former Forest Park officer had once attempted to grab her chest in an apparently sexual manner. Stevens had never before reported this incident while the former officer was employed by Forest Park.

11

Stevens was disciplined on the grounds that she had violated Chief Hobbs's General Order #31, which states: (1) that it is Departmental policy to provide accurate and truthful information about former employees to outside parties and (2) that only the Chief (or a person he authorizes) may disclose such information to outside parties.

Third, also in February 2012, Stevens filed a complaint against Captain Mark Harris (a white male) and Lieutenant Amy Hiers (a white female). Stevens alleged that she was repeatedly "attacked" by them and was scared to work with them. Major Matson, who reviewed the complaint, found it to be disjointed and confusing. The Department investigated and ultimately reprimanded Stevens for her own role in the conflict between the officers and her inappropriate behavior towards Lieutenant Hiers.[11]

The accident review incident, outlined above, occurred in August 2012.

## II.  STANDARD OF REVIEW

We review <u>de novo</u> the district court's grant of summary judgment, construing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party. <u>Baloco v. Drummond Co., Inc.</u>, 767 F.3d 1229, 1246 (11th Cir. 2014). Summary judgment is appropriate only when "there is no

---

[11]According to Matson, Captain Stevens exhibited erratic behavior during their meeting to discuss the complaint. Stevens denies this, and thus we do not consider that contention.

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A mere scintilla of evidence supporting the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be sufficient evidence for a reasonable jury to find in her favor. Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009).

### III.  GENERAL LEGAL PRINCIPLES

Discrimination claims arising under Title VII, § 1983 and the Equal Protection Clause are analyzed under the same analytical framework. See Bryant v. Jones, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009); Koch v. Rugg, 221 F.3d 1283, 1297 n.31 (11th Cir. 2000). Plaintiff Captain Stevens does not dispute that the McDonnell Douglas framework applies to her discrimination case based on circumstantial evidence.

Under this framework, the plaintiff must first establish a prima facie case of employment discrimination. See Flowers v. Troup Cty., Ga., Sch. Dist., 803 F.3d 1327, 1336 (11th Cir. 2015). To do this, she must show that: (1) she is a member of the protected class; (2) she was qualified to do the job; (3) she was subject to an adverse employment action; and (4) either she was replaced by someone outside her protected class or she received less favorable treatment than a similarly-situated employee outside of her protected class. Id.

13

If the plaintiff makes this showing, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the adverse employment action. Id. If the employer does so, the plaintiff must demonstrate that the employer's proffered reason is a pretext for discrimination. Id. A plaintiff may show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304, 1308-09 (11th Cir. 2012) (quotation marks omitted). If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot merely recast the reason, but must "meet that reason head on and rebut it." Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

It is settled that a reason cannot be a pretext for discrimination unless it is shown both that the proffered reason was false and that discrimination was the real reason. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752 (1993). Evidence supporting a prima facie case of discrimination, combined with evidence that an employer's proffered justification was false, could support an inference of discrimination sufficient to defeat summary judgment. See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088, 1091 (11th Cir. 2004); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48, 120 S. Ct. 2097, 2108-09 (2000). However, a defendant is entitled to summary judgment where, although

the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.  See Flowers, 803 F.3d at 1339; see also Reeves, 530 U.S. at 148, 120 S. Ct. at 2109.

The McDonnell Douglas framework "is not the sine qua non for a plaintiff to survive summary judgment in a discrimination case," and a plaintiff will always survive summary judgment "if [she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  Sims v. MVM, Inc., 704 F.3d 1327, 1333 (11th Cir. 2013) (quotation marks omitted).  Such an issue exists if the record, viewed in the light most favorable to the plaintiff, presents a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  Id. (quotation marks omitted).

## IV.  ANALYSIS OF CAPTAIN STEVENS'S CLAIMS

**A.    Prima Facie Case**

Defendants argue that the district court erred in concluding that Stevens was subject to an adverse employment action.  Defendants emphasize that, while she was initially terminated for not signing the Last Chance Agreement, Stevens was permitted later to resign.  Because Stevens ultimately resigned, defendants argue, no adverse employment action was ever taken against her.

15

We disagree.  In the light most favorable to the nonmoving party, Captain Stevens was effectively terminated and only resigned thereafter because she had no choice.  Defendants admit they made her employment contingent on her signing the Last Chance Agreement.  When she refused to sign the Agreement, defendants terminated her but then allowed her to resign on the day of her appeal hearing.  At that point she was resigning to avoid a termination record.  Given all events taken together, we cannot say that Stevens has not shown an adverse employment action for the purpose of making a prima facie case.

**B.    Pretext**

Plaintiff Captain Stevens argues that defendants' proffered reasons for offering her the Last Chance Agreement and later terminating her were pretextual. Stevens asserts that (a) she did not violate any Department policy in the Olascoaga or GBI incidents; (b) similarly-situated employees were treated less harshly than Stevens; and (c) Major Matson demonstrated gender bias before and after the Olascoaga incident.  We discuss each item separately.

**C.    The Olascoaga Accident Review**

The revised Last Chance Agreement chastised plaintiff Captain Stevens for exercising poor judgment and unprofessionalism inconsistent with Department standards for its captains and for violating Department policies, citing the Olascoaga incident along with three other incidents.  Stevens has not shown that

Chief Hobbs did not honestly believe that her conduct warranted a Last Chance Agreement and then termination.

Captain Stevens argues that there was no explicit Department policy requiring that accident review panels receive and review complete accident review packets (including photographs). Stevens testified that panels frequently decided whether an accident was chargeable based solely on a verbal description of the accident. Neither she nor any officer she knew had been disciplined "for conducting an accident review panel without having the complete packet available." The Department does have written policies stating that detailed photographs must be made of accidents involving city property or vehicles. Stevens stresses that these policies still do not specifically state that accident review panels must review the photos of the accident. Of course, defendants argue, that is the whole point of the photos and accident review packet.

In any event, Captain Stevens emphasizes that the first review panel officers' written statements and sworn testimony do not reflect them feeling threatened or intimidated by her. Stevens argues that she accurately described the accident to them. Stevens also points out that her non-chargeability finding was not "utterly unsupportable," and Lieutenant Armstrong, although not a review panel member, admitted that it "could go either way."

17

The district court did not err in concluding that Captain Stevens failed to show pretext as to the Olascoaga incident.  It is clear that photographs were supposed to be taken of Officer Olascoaga's accident and that as a matter of best practices Stevens should have shared them with the original review panel as it considered whether the accident was chargeable.  Stevens outranked each panel officer and advised each that the accident was non-chargeable.  The Last Chance Agreement persuasively stated how this could have improperly influenced the panel:

> The significant difference between your rank and [the panel officers'] was at best a factor creating undue influence over their abilities to render independent judgments.  At worst, the manner you used was intimidating, due largely to the strong opinion you voiced before they had an opportunity to form their own judgments about the facts, and the fact that you are a captain and they are merely sergeants.  They understood that you expected them not to exercise their own independent judgment and discretion, but rather, to echo, or rubber-stamp your conclusions.  Thus, their review was a mere formality. From your experience as an investigator and as a manager, you should be keenly aware that this is not a competent, honest, nor a professional manner in which to conduct any investigation.

Although Stevens disputes the Agreement's description of her demeanor, she does not dispute approaching the original panel officers about what finding to make. The record indicates that Chief Hobbs saw the photographs and accident packet and reasonably concluded that Stevens's "non-chargeable" finding was unsupportable and that her accident description had misled panel members. Further, a second review panel, upon reviewing the accident packet, unanimously

18

found that the accident was chargeable.  Importantly, it is irrelevant whether defendants' decision to take adverse action against Stevens was imprudent or even unfair, so long as it was not discriminatory.  See Flowers, 803 F.3d at 1338.  Stevens's evidence does not rebut the fact that Chief Hobbs disciplined Stevens because he honestly and reasonably believed that she acted improperly.  There is no evidence of a discriminatory motive.

**D.    GBI Reference Check**

Plaintiff Captain Stevens also argues that back in February 2012 she did not violate any Department policy by telling a GBI officer that a former Forest Park officer had once attempted to grab her chest.  As noted above, Stevens was disciplined for this incident (which was cited in the Last Chance Agreement).

The February 2012 disciplinary report, that Stevens received, stated that she violated Chief Hobbs's General Order #31 by providing undocumented information that could not be verified during a job reference.  Order #31 states that (a) only the Chief of Police or persons to whom the Chief provides explicit written authority may provide any information or opinion about any Forest Park Police Department employee or former employee to any outside person or entity; and (b) it is the policy of the Forest Park Police Department to provide accurate and truthful information concerning its employees and former employees.

19

Stevens does not dispute that she had not reported the groping behavior of the former officer before she told the GBI officer about it.  In fact, when presented with the February 2012 disciplinary report stating that her disclosure of unverifiable information fell "outside the scope of General Order #31," Stevens checked a box stating that she concurred with this statement (although she clarified that her intention was to be truthful).  Even assuming arguendo that this GBI incident played a material role in Stevens's ultimate termination, her evidence fails to create a triable issue concerning pretext.

### E.    Comparators

Plaintiff Captain Stevens also argues that she was disciplined more harshly than similarly-situated peers, inviting an inference that her firing was discriminatory and that defendants' proffered reasons for doing so were pretextual. In determining whether employees are similarly situated, we consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.  Burke-Fowler v. Orange Cty., 447 F.3d 1319, 1323 (11th Cir. 2006).  Where a plaintiff and a comparator are disciplined differently, the quantity and quality of a comparator's misconduct must be "nearly identical" to that of the plaintiff for this to support the plaintiff's discrimination claim.  See id. Applying this standard, Stevens's argument fails.

20

Captain Stevens primarily points to Lieutenant Armstrong, an African-American male who was subordinate to her. Lieutenant Armstrong concurred that Officer Olascoaga's accident was non-chargeable and did not change his finding when urged by Major Matson. Armstrong was not disciplined, and was later promoted to plaintiff's former position. However, Stevens's argument ignores that Armstrong did not approach any of the three review panel members and advise them that Olascoaga's accident was non-chargeable while failing to give them the review packet. Captain Stevens approached all three of them. Even setting aside Stevens's prior disciplinary history, we find that Lieutenant Armstrong is a poor comparator.

Stevens also argues that she is similarly situated to Captain Harris, a Caucasian male, who found a 2011 accident to be non-chargeable and was overruled by Major Matson. Stevens notes that, although Harris was on a Last Chance Agreement at the time, he only received verbal counseling. However, there is no record evidence that Harris gave his panel a misleading description of the accident in question, failed to provide them with evidence material to their determination or advised them the accident was non-chargeable (the panel unanimously found the accident was chargeable). Harris, too, is a poor comparator.

21

**F.    Evidence of Major Matson's Bias**

Plaintiff Captain Stevens also argues that Major Matson had on several occasions demonstrated gender bias, and suggests that, due to his integral role in her termination, this casts suspicion on Chief Hobbs's proffered bases for her termination.  When denying Stevens's request to transfer a female officer to her shift sometime in 2011, Matson allegedly commented that "there's too much estrogen on your shift."  Stevens also points to a September 2011 email in which Matson said, "Lemme guess . . . your hat says 'bitchy'?" in response to an email that Stevens had sent to several people that included a photograph depicting two female soldiers whose last names, "Moody" and "Kuntz," were embroidered on the back of their hats.  Additionally, Stevens alleges that Matson handed her the original proposed Last Chance Agreement on pink paper, and that he condescendingly stated that pink was her favorite color because she was a girl.  In her reply brief, Stevens additionally cites Matson's inappropriate interest in her romantic life and Matson's pattern of attributing female officers' work mistakes to problems in their personal lives.

Stevens specifically asserts a "cat's paw" theory of discrimination, suggesting that Chief Hobbs's decision to offer her a Last Chance agreement was the product of Major Matson's gender bias.  A plaintiff may show that discriminatory animus caused an adverse employment action by proving that a

22

biased party with no power to take the adverse action made a recommendation that directly resulted in the action. See Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331 (11th Cir. 1999). Under this standard, a plaintiff may maintain a "cat's paw" theory of discrimination by establishing that the decisionmaker followed a biased recommendation without independently investigating it. See id. at 1332.

The problem for plaintiff Captain Stevens is that Chief Hobbs did not merely accept Matson's assessment of Stevens without investigating and reaching his own conclusions. The record reflects that Hobbs personally reviewed Stevens's disciplinary history, personally spoke with Stevens at length prior to her termination (thereby giving her the opportunity to tell her version of events), and personally revised the Last Chance Agreement. Notably, many critical facts that motivated Hobbs to discipline Stevens are not in dispute, namely that Stevens approached panel officers with the conclusion that the accident was non-chargeable without providing the officers with photographs of the accident.[12] Given Chief Hobbs's level of involvement in the process leading up to Stevens's termination, Stevens fails to plausibly show that the adverse action she suffered was the product of Matson's alleged bias.

---

[12]Also, Matson's initial recommendation was to fire Stevens, which Chief Hobbs rejected. This further suggests that Hobbs's thinking was independent from that of Matson.

23

## G.    Prior Incidents

Plaintiff Captain Stevens argues that facts surrounding her prior disciplinary incidents support her discrimination claim.  Stevens specifically focuses on her 2012 dispute with Captain Harris and Lieutenant Hiers, arguing that she (a) did not behave erratically; (b) was needlessly pressured to meet with the Department's therapist; (c) raised legitimate complaints about Lieutenant Hiers's job performance that were never investigated; and (d) was unfairly disciplined while Lieutenant Hiers was not.  Stevens stresses Matson's role in this incident.

Even granting that Stevens's full disciplinary history played a role in her ultimate termination, the fact disputes she raises still fail to raise an inference of discrimination by Chief Hobbs, the decisionmaker here.  The evidence shows that Chief Hobbs had a reasonable basis for his honest belief that Stevens's performed improperly as a police captain, and more to the point, no reasonable juror could find that Stevens was the victim of discrimination by defendant Chief Hobbs.[13]

## V.  CONCLUSION

For all the foregoing reasons, we affirm the district court's grant of summary judgment in favor of defendants.

**AFFIRMED.**

---

[13]For this reason, we also find no convincing mosaic of circumstantial evidence giving rise to an inference of race or gender discrimination.