[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14398
Non-Argument Calendar
_____

D.C. Docket No. 5:16-cv-00848-MHH


CHARLIE J. BARBER, II,

                                                            Plaintiff-Appellant,


versus


CELLCO PARTNERSHIP,
d.b.a. Verizon Wireless,

                                                            Defendant-Appellee.


_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(April 8, 2020)

Before JORDAN, NEWSOM, and BRANCH, Circuit Judges.

PER CURIAM:

Charlie Barber, proceeding *pro se*, appeals from the district court's grant of summary judgment in favor of Cellco Partnership, d.b.a. Verizon Wireless ("Verizon"), on his claim of discrimination brought under the Americans with Disabilities Act ("ADA") and its dismissal of his pendent state law tort claims. Barber argues that the district court erred in determining that Verizon's reasons for its decision not to promote him were legitimate and nondiscriminatory and that the district court erred in dismissing his tort claims. After a review of the record, we affirm.

## I. Background

Because the parties are familiar with the facts, we set out only the most relevant details for the purposes of this appeal. Barber filed an amended complaint against Verizon, raising claims of discrimination under the ADA and intentional infliction of emotional distress or outrage under Alabama law.[1] He alleged the

---

[1] Barber's initial complaint asserted a negligence claim against Verizon for denial of workers' compensation benefits. The court dismissed this claim with prejudice. Barber's first amended complaint asserted a federal ADA claim for discrimination on the basis of disability with a wide range of alleged forms of discrimination. The only factual bases for the discrimination listed in the amended complaint were the denial of workers' compensation benefits and Verizon's failure to promote Barber. After a telephone conference on July 27, 2017, the district court treated Barber's discrimination claim under the ADA to be based on the alleged failure to promote him. Since Barber did not contest that interpretation of his claim, any alternative bases for ADA discrimination which he might have otherwise pursued are waived.

following.  On August 8, 2013, he injured his back while working for Verizon, which he reported as a worker's compensation claim.  Verizon did not act or follow the proper procedures regarding the claim.  Upon returning to work after taking a leave of absence from May through August 2014, he learned that two of his coworkers had received promotions.  Barber alleged that the reason he was not promoted was discrimination against him because of his disability.

After discovery, the parties filed cross motions for summary judgment. Verizon submitted several exhibits along with its motion, including Barber's deposition, which together showed the following.  Barber was hired by Verizon in 2005 and several years later was promoted to the position of Member Technical Support 1 ("MTS 1").  Barber was responsible for providing technical support services to call center employees, which included installing equipment, transferring equipment between various offices, and trouble-shooting devices.  Barber claimed to have injured his back in August 2013 while lifting a seventy-five pound server. According to Barber, he informed Schumacher of his injury the day after it occurred and the two discussed worker's compensation.  According to Schumacher, Barber reported the alleged injury to him in December 2014.  Barber was diagnosed in May 2014 with spinal osteoarthritis and sciatic nerve damage. The injury impacted Barber's ability to perform his job, which involved replacing computers, lifting monitors, and handling cords under tables.

In 2013, at some point after Barber injured his back, he was assigned as the lead for a project called the "IPACD roll-out," which involved installing a server, swapping out old phones for new phones, and removing the old telephone cords at the Huntsville call center. As the project lead, it was ultimately Barber's responsibility to ensure that his team of IT employees completed the project. Barber did not ensure that the old phones and cords were removed, either personally or through his team.

Also in 2013, Barber began having issues arriving at and departing from work on time. Barber's scheduled hours at that time were from 9:00 AM until 6:00 PM. Barber sent a number of emails to Schumacher in 2013 and 2014, all of which were sent after 9:00 AM, informing Schumacher that he would be arriving after 9:00 AM or leaving the office before 6:00 PM on the day he sent the messages.[2] Schumacher reported that Barber would sometimes arrive late without

_____

[2] Verizon submitted these emails as attachments to Barber's deposition, which Verizon attached to its motion for summary judgment. We summarize them here for context. In an email sent on August 7, 2013, at 10:37 AM, Barber wrote "Hey, I'll be in around 12 or 1. Is that cool?" In an email sent on August 15, 2013, at 11:22 AM, Barber wrote that he was submitting a request for the day off. In an email sent on September 12, 2013, at 9:46 AM with the subject line, "Running late," Barber wrote "[b]e there about 930a." In an email sent on September 30, 2013, at 9:55 AM, Barber wrote in the subject line "[b]e there around 9:30." In an email sent on October 2, 2013, at 10:47 AM, Barber wrote that he was running late because of a doctor's appointment, would be at work in 2 hours, and would use 2 hours of vacation time. In an email sent on January 23, 2014, at 10:13 AM, Barber wrote that he was moving "a little slow" and would be in "momentarily." In an email sent on March 17, 2014, at 9:47 AM, Barber wrote that he would be arriving late because he was getting his license plate renewed. In an email sent on April 7, 2014, at 9:50 AM, Barber wrote that he was moving "a little slow" but would be coming in to work. In an email sent on April 17, 2014, at 10:18 AM, Barber wrote that he would be in to

informing Schumacher at all. Barber admitted that he was occasionally late to work, though he attributed his tardiness to his back injury.

On top of these issues, Schumacher received two separate complaints about Barber's lack of professionalism: one on December 19, 2013 regarding an incident where Barber was allegedly angry and dismissive towards a customer service director, and another on April 29, 2014 regarding several encounters a customer operations advisor had with Barber where he was allegedly "hostile and argumentative" towards her.[3] Schumacher also noted that Barber was hard to reach, as he did not empty his voicemail box.

Verizon addressed these issues with Barber. Schumacher documented a "counselling discussion" dated December 9, 2013, in which Schumacher stated that, while Barber did a good job with the day to day responsibilities of his job, he had shown a pattern of showing up to work past his normal starting time.[4] Verizon also documented conversations with Barber regarding these issues in his 2013 and

---

work "around 1pm." Lastly, in an email sent on May 19, 2014, at 1:37 PM, Barber wrote that he would be leaving for the day.

[3] Barber admitted that he had been involved in the December 2013 incident with the first complaining employee. However, Barber described the incident very differently from the complaining employee. Barber did not recall an incident involving the second complaining employee in 2014. Verizon submitted the emails from the two employees describing their versions of the incidents.

[4] The counselling document stated that Barber's starting work time was 9:30 a.m., this appears to be a mistake, as both Schumacher and Barber agreed that Barber's shift was from 9:00 to 6:00.

2014 year-end performance evaluations, filled out by Schumacher. In the 2013 performance evaluation, Schumacher stated that Barber needed to "focus on some key bullet points for improvement." Regarding the IPACD project, Schumacher stated that Barber had done a "good job overall" as project lead but failed to remove all the old phones. Schumacher also noted that Barber had a "trend" of not arriving at work on time, which meant that his coworkers had to make up for the work that he missed. Schumacher stated that Barber was ready for a promotion to MTS 2 from a technical standpoint but that he would like for Barber to focus on arriving to work on time. In the 2014 performance evaluation, Schumacher commented that Barber had failed to remove all of the phone cords during the IPACD project and had been a "no call no show" on another project. He also noted the feedback from Barber's coworkers regarding Barber sometimes being confrontational or "very unapproachable."

In April 2014, Schumacher and Mike Dohar, Schumacher's manager, received instructions from corporate headquarters regarding the promotion process for MTS 1 employees, the position Barber held, to MTS 2 positions, the next level of responsibility for technical employees. Dohar and Schumacher decided not to promote Barber to MTS 2 because they believed that Barber lacked the leadership qualities required for that position, largely because of Barber's unprofessional exchanges with his coworkers, frequent tardiness without advance notice, failure to

6

empty his voice mailbox, and failure to complete certain projects.  Thus, on May 14, 2014, Schumacher recommended that only two MTS 1 employees, Adonis Hart and Jay Sadler, receive promotions.[5]

Barber submitted a formal request to work from home in October 2014. Though that request was denied because the medical paperwork did not reflect a need to telecommute, Schumacher ordered Barber a lumbar cushion and footstool in an effort to accommodate his injury.  After Barber resubmitted his request in 2015, Verizon allowed Barber to have a flexible work schedule, provided that Barber gave notice the night before the start of his shift.  Pursuant to the medical advice it received from Barber's doctor, in April 2015 Verizon also granted the following accommodations: Barber was to refrain from lifting, twisting, and excessive bending; Barber did not have to lift anything that weighed more than five pounds; Barber could sit down whenever he felt his back hurting.  Seven months

---

[5] In support of his motion for summary judgment, Barber submitted results from customer service surveys for 2012 through 2015 for himself and Hart and Sadler.  2012 results showed that Barber had received an average score of 5.00, Sadler had received an average of 4.95, and Hart had received an average of 4.97.  2013 results showed that Barber had received an average score of 4.98, Sadler an average of 4.95, and Hart an average of 4.97.  The 2014 results showed that Barber had received an average score of 5.00 and Sadler an average of 4.99.  The 2015 results showed that Barber had received an average score of 5.00 and Sadler an average of 4.99.  In support of his response to Verizon's motion for summary judgment, Barber submitted a number of documents, including an email that he sent to Schumacher on December 31, 2014, which referenced a question that Barber had asked about worker's compensation earlier that month.  Barber also submitted two documents titled "One on one with Todd," dated September 26, 2014, and October 3, 2014, that contained various performance scores that Barber had received during 2014 and a comment from Schumacher that Barber was doing a "[g]reat job" and "continue[d] to WOW his end users which shows in his high customer sat score."

after Verizon made these accommodations, Barber filed suit against the company for disability discrimination.

The district court granted Verizon's motion for summary judgment as to Barber's ADA claim. It began by assuming that Barber had established a *prima facie* case of disability discrimination, noting that Verizon had conceded for purposes of summary judgment that Barber could establish such a case. It then determined that Verizon had provided four legitimate, nondiscriminatory reasons for its promotion decision: Barber's (1) pattern of tardiness, (2) unprofessional encounters with other employees in the months leading up to the promotion decision, (3) failure to ensure that all of the equipment was removed during the IPACD project, and (4) failure to empty his voice mailbox. The district court concluded that Barber had not offered any evidence to rebut or undermine the credibility of Verizon's legitimate, nondiscriminatory reasons for its promotion decision, noting that Barber's pattern of tardiness was undisputed.[6] It also concluded that Barber had not presented circumstantial evidence from which a jury could infer discriminatory intent was the real motive for not promoting Barber. Accordingly, as to Barber's ADA claim, the district court granted Verizon's

---

[6] The district court did find that the record generally showed Barber had received favorable performance evaluations and had strong technical skills, but it stated that those evaluations did not preclude Schumacher from considering other concerns regarding Barber's performance.

motion for summary judgment and denied Barber's motion. Because its ruling left it without an independent basis for subject matter jurisdiction, the district court declined to exercise supplemental jurisdiction over Barber's state law tort claims.

The district court entered judgment in favor of Verizon as to Barber's ADA claim and dismissed his state law claims without prejudice. Barber timely appealed.

## II. Standard of Review

We review the district court's rulings on cross-motions for summary judgment *de novo*, viewing the facts in the light most favorable to the nonmoving party on each motion. *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" after considering all evidence in the record, including pleadings, depositions, and affidavits. Fed. R. Civ. P. 56(a); *see Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). "If the non-moving party fails to 'make a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' then the court must enter summary judgment for the moving party." *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In cases of discrimination supported by circumstantial evidence, we use the

framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 248 (1981), under which a plaintiff bears the initial burden of making a prima facie case of discrimination and then must rebut any legitimate reason offered by the employer for an adverse employment action by showing pretext. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087–88 (11th Cir. 2004).

We review a district court's decision not to exercise supplemental jurisdiction over state law claims for abuse of discretion. *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 738 (11th Cir. 2006).

## III. Analysis

### A. The District Court Did Not Err in Granting Summary Judgment

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Failure to promote is analyzed under the rubric of other ADA discrimination claims. *See Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000); *see also Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1291 (11th Cir. 2002) (a "failure to promote" is a "discrete discriminatory act" and constitutes an "adverse employment decision"). "The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA claims."

10

*Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999). "In order to establish a prima facie ADA violation, [a plaintiff] must demonstrate that [he] is a qualified individual with a disability and was discriminated against because of that disability." *Durley v. APAC, Inc*., 236 F.3d 651, 657 (11th Cir. 2000). Once a plaintiff makes a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015). If an employer clears this "low bar" of production, the plaintiff's *prima facie* case is rebutted, all presumptions drop from the case, and the plaintiff is then required to show that the employer's proffered reason for the action is a pretext for discrimination. *Id.*

### 1. The Relevant Standards and Arguments

Barber makes the claim that we should use a "mixed motive" test in ADA discrimination cases, *i.e.*, whether discrimination was simply one of several reasons for not promoting Barber. The mixed motive standard was articulated by the Supreme Court in *University of Texas Southwestern Medical Center v. Nassar* to apply to five specific bases for Title VII actions: race, color, religion, sex, and national origin. *See* 570 U.S. 338, 343, 359–60 (2013). *Nassar*'s decision was based entirely on the text of Title VII, *id*. at 348–357, and so does not control a

11

discrimination case based on the ADA.[7]  As neither the statutory text nor binding

case law demonstrate that we must apply a mixed motive causation analysis to

ADA discrimination claims, we decline to do so here.[8]

In discrimination cases governed by the *McDonnell Douglas* framework,

Barber first must make out a *prima facie* case that the adverse employment

decision—Verizon's failure to promote him—was based on discrimination.  As we

stated in *Lewis v. City of Union City, Georgia*, discrimination is "treating like cases

differently." 918 F.3d 1213, 1222 (11th Cir. 2019) (*en banc*) (quoting *N.L.R.B. v.

Collier*, 553 F.2d 425, 428 (5th Cir. 1977)).  We further clarified that to establish a

*prima facie* case of discrimination under *McDonnell Douglas*, a plaintiff must

point to a proper comparator: "By its very nature, therefore, discrimination is a

comparative concept—it requires an assessment of whether 'like' (or instead

different) people or things are being treated 'differently.'"  *Id*. at 1223.[9]

---

[7] Indeed, the Court in *Nassar* based its holding in part on the difference between the statutory text of Title VII and the ADA.  *See* 560 U.S. at 357.

[8] We note, however, that even if we analyzed this case under a mixed motive framework, Barber would still be required to set out a *prima facie* case of discrimination and show that Verizon's proffered reasons for failing to hire him were pretextual.  *Hilburn*, 181 F.3d at 1226. As discussed below, we find that Barber has failed to meet either prong of his burden, and so the mixed motive standard would not change the outcome of this case.

[9] Barber protests that the district court erroneously forced him to provide comparator evidence to establish discrimination.  Specifically, Barber argues that he is "not required to identify a comparator in order to plausibly allege discrimination" and that "[c]omparator evidence is one way, but not the only way, to establish discriminatory motive."  We do not read the district court opinion as requiring Barber to "identify a comparator" to "allege" or "establish" discrimination.  Instead, the district court pointed to the lack of comparator evidence as one

Barber produced no comparator evidence, or any other evidence, of discrimination on the part of Verizon.  To the contrary, the record evidences that Verizon made numerous accommodations for Barber, even going so far as to excuse his months-long absence in 2014, which was not pre-approved medical leave time.  Verizon responded promptly to inquiries Barber directed to various personnel about accommodations and workers compensation for his injury, and Verizon independently contacted Barber's doctor to ensure that they were providing accommodations that met Barber's medical needs.

Barber argues that the temporal proximity between his injury and the decision to not promote him was evidence of discrimination.  To be clear, Barber is not claiming a temporal proximity with his date of injury, nor a temporal proximity to when his employers learned of his back condition—simply proximity to the "condition" itself.  This sort of proximity, i.e., anything done by the employer while the employee suffers from a continuing ailment, is not what this circuit considers as temporally proximate evidence.  We have considered temporal proximity relevant in a disability discrimination context, but only when the adverse employment action is very close in time to a discrete event, such as when employers learned about the basis for the alleged discrimination.  *See, e.g., Farley*

---

reason that it ruled Barber had not established Verizon's pretext.  The district court actually presumed without deciding that Barber had established discrimination.

*v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (finding relevant that the employer learned about the plaintiff's discrimination charge seven weeks before terminating the plaintiff's employment).  Barber's view of "temporal proximity"—that anything which occurred while he suffered from a disability, which he alleges is permanent, is temporally proximate—eviscerates the meaning of temporal proximity.  However, we need not contemplate Barber's novel theory because we find that, in any case, he has not met his burden to show pretext.

### 2. Whether Barber Has Shown Pretext

Regardless of whether Barber made out a *prima facie* case of discrimination, Barber has also not sufficiently rebutted Verizon's proffered legitimate reasons for not promoting him.  In order to prove pretext, a plaintiff must show by a preponderance of the evidence that the proffered reason was false and discrimination was the true reason for the action.  *See Hilburn*, 181 F.3d at 1226.  The plaintiff must rebut the reason "head on" and "cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)).  When an employer offers multiple reasons for its action, the plaintiff must show that each reason was pretextual in order to avoid summary judgment.  *Chapman*, 229 F.3d at 1037.  We have stated that a plaintiff "may demonstrate that [an employer's] reasons were pretextual by revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in

[the employer's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'" *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (quoting *Cooper v. Southern Co*., 390 F.3d 695, 725 (11th Cir.2004)).

Barber contends that the district court erred in granting summary judgment to Verizon because the reasons Verizon articulated for not promoting Barber were implausible and contradictory. Specifically, Barber argues that he proved Verizon's stated reasons were pretextual because he received high customer satisfaction ratings, which marginally outranked his two competitors. But in the context of a failure to promote claim, "a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted." *Springer*, 509 F.3d at 1349 (alteration in original) (quoting *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006)). Rather, "he must show that the disparities between the successful applicant's and his own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Id.* (quoting *Cooper*, 390 F.3d at 732). An employer's subjective reasons for choosing one candidate over another—such as a candidate's leadership ability, tact, or maturity—are just as valid as objective reasons if the employer articulates a "clear and reasonably

15

specific factual basis" for those reasons. *Denney v. City of Albany*, 247 F.3d 1172, 1185–86 (11th Cir. 2001) (quoting *Chapman*, 229 F.3d at 1034). Here, while Barber's customer satisfaction ratings may have been slightly higher than the two MTS 1 employees who received promotions (Sadler and Hart), there was not such a difference that "no reasonable person" would have promoted Sadler and Hart but not Barber. *See Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1255 (11th Cir. 2000) (holding that evidence showing an employee was more qualified in one area relevant to a promotion did not demonstrate that promoting a different employee was unreasonable such that discrimination must be at play). Further, Schumacher and Dohar were entitled to consider qualifications for leadership outside of Barber's customer satisfaction surveys, which the record indicates they did.

Barber also alleges that the inconsistencies in Schumacher's statements to him at work and in this lawsuit show that Verizon's justifications were pretextual. We find no inconsistency in Schumacher's statements. A manager may compliment one aspect of an employee's performance while critiquing another.

Finally, Barber attempts to discredit some of the proffered explanations that the company offered. First, as to his timeliness, he asserts that coming into work late was an accommodation to his injury and was also standard procedure for the company. Second, as to his unprofessionalism, he points to an email from one of the employees who complained against him where the employee thanked Barber

16

for his assistance, as well as Barber's own testimony about how the interaction went differently than described by Verizon. Third, as to his failure to ensure that all of the old phones and cords were removed at the IPACD project, Barber argues that he was prevented from doing so because of his back injury and that Schumacher knew this reason when he criticized Barber. Finally, Barber asserts that whether his voicemail inbox was full had no impact on his promotion because it was never brought up in his evaluations.

These arguments do not merit much discussion. Barber offers no evidence to show that it was an acceptable or standard practice at Verizon for employees to come in late to work, and the record says otherwise. Although Verizon granted Barber a flexible work schedule to accommodate his back injury in 2015—*after* the issue had developed over the two prior years—the company still required Barber to inform his manager ahead of time if he would be arriving late. The emails from Barber show that this practice was not followed. As to Barber's evidence that he did not actually treat fellow employees badly, our precedent forecloses that argument:

> The question is not whether it really was [the employee]'s fault that assignments were not completed on time, or whether she did delegate excessively, or whether she was aggressive and rude to her colleagues and superiors, or whether she actually lost an important document or truly did fall asleep at her desk. The question is whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so.

17

*Alvarez*, 610 F.3d at 1266. The reality of what happened does not matter because Verizon provided documentation from the employees to management upon which management could have legitimately relied. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (in evaluating pretext, the court must focus on whether the decisionmakers believed that the employee was guilty of the act and whether that belief was the reason for termination). With these two proffered nondiscriminatory reasons for failing to promote unrebutted by Barber, we need not address the third and fourth legitimate reasons Verizon proffered. *Chapman*, 229 F.3d at 1037. Barber has not met all of Verizon's reasons for failing to promote him "head on" as is required to survive summary judgment. *Id.* at 1030, 1037.

B. The District Court Did Not Abuse Its Discretion by Declining to Exercise Supplemental Jurisdiction over State Law Claims

After granting Verizon's motion for summary judgment as to Barber's ADA claim, the district court found there was "no longer an independent basis for subject matter jurisdiction," and, pursuant to 28 U.S.C. § 1367(c)(3)[10], declined to exercise supplemental jurisdiction over Barber's remaining state law claims. It therefore dismissed those claims without prejudice.

---

[10] 28 U.S.C. § 1367(c)(3) provides that "district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."

"With respect to supplemental jurisdiction in particular, a federal court has subject-matter jurisdiction over specified state-law claims, which it may (or may not) choose to exercise." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009). "A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Id.*

Barber argues that it was error for the district court to dismiss his state law claims for intentional infliction of emotional distress or outrage after granting summary judgment on his federal claim. But he does not offer any argument or case law to support his position that the district court abused its discretion. And, reviewing the district court's order, we find no grounds for ruling that the district court abused its ample discretion in failing to exercise supplemental jurisdiction over these claims.

## IV. Conclusion

The district court did not err in granting summary judgment in Verizon's favor because Barber failed to rebut Verizon's legitimate, non-discriminatory reasons for its promotion decision. Additionally, Barber cannot win on his challenge to the district court's dismissal of his pendent state law tort claims, as he mentions the issue only in passing and does not cite any relevant authority or develop a supporting argument.

**AFFIRMED.**