[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-12530

Non-Argument Calendar

_____

DEVONA STEVENSON,

Plaintiff-Appellant,

_versus_

CITY OF SUNRISE,
a municipality,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:18-cv-62404-RAR

_____

Before WILSON, ROSENBAUM, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Devona Stevenson appeals the district court's grant of summary judgment to the City of Sunrise, Florida on her race discrimination, sex discrimination, and retaliation claims. After careful review, we affirm.

I.

Stevenson, a Black female police officer, has been employed by the City of Sunrise for over two decades.[1] In October 2016, Stevenson applied to become a Field Training Officer ("FTO") for the City. FTOs train and evaluate new police recruits. They also earn additional pay for their duties.

A prerequisite to becoming an FTO is to attend and complete a state-certified FTO training program. Stevenson was approved to attend the program, and in January 2017, she attended and completed it.

It is undisputed, however, that assignment of trainees to FTOs was not automatic upon completion of the state-certified training program. As Luis Castro, one of the officers who oversaw the City's FTO program, testified, "The mere fact that an officer

---

[1] Because we are reviewing the district court's order on a motion for summary judgment, we recount all facts in the light most favorable to Stevenson, the nonmoving party. *See infra* Part II.

attends and completes the state-certified training program does not automatically guarantee that the officer will be assigned trainees at the City or otherwise be known as an 'Active FTO.'" Doc. 40-3 at 2.[2] In deciding whether to assign trainees to an FTO, "the City considers factors, including but not limited to, an officer's internal affairs history, disciplinary history, work product, sick time utilized, and evaluations," as well as "[t]he nature of the officer's internal affairs investigations and discipline." *Id.* (citing the City's Police Department's Policies and Procedures Manual).

Stevenson was never assigned FTO trainees. Castro worked in conjunction with other FTO supervisors "regarding decisions whether to assign trainees to eligible" FTOs, *id.*, and he and his colleagues decided not to assign Stevenson any trainees for multiple reasons. Stevenson's yearly performance evaluation for May 2016 through May 2017, which her supervising officer Jimmy Patrizi completed, was "satisfactory," a rating that "disqualifies an officer from receiving trainees as part of the City's FTO program." *Id.* at 3; *see* Doc. 46-4 at 23 (City's Policy and Procedures Manual, which states that FTO applicants "must . . . [b]e above satisfactory in Department standards concerning job performance and appearance"). She received the same rating the following year. Castro testified that even if Stevenson had received "above average" evaluations for these time periods—a rating that would have qualified her to train new recruits—"she still would not have received trainees."

---

[2] "Doc." numbers refer to district court docket entries.

Doc. 40-3 at 3. Castro reported that Stevenson had a "significant and extensive disciplinary and internal affairs history," "exhibited an apathetic attitude, consistently utilized a significant amount of sick time, [and] did not possess as strong of a work ethic as other FTO[]s." *Id.* at 3–4. Plus, he testified, "there were departmental concerns regarding her accountability and reliability." *Id.* According to Castro, Stevenson was "simply not fit to train." *Id.* at 4.

Castro's impressions were echoed by the other officers in charge of the FTO program. Paul Katz, another lieutenant who oversaw the FTO program and who "worked in conjunction with" Castro "regarding the decisions whether to assign trainees to particular FTO officers," identified six incidents predating Stevenson's FTO training that resulted in discipline or an internal affairs investigation and that factored into their decision not to assign her trainees. Doc. 40-8 at 1–2. Twice, she "fail[ed] to properly search a prisoner while making an arrest"; in the early 2000s she "fail[ed] to initially document and author an incident report after she found a one year [old] child wandering in the roadway after escaping a caretaker's house"; in 2014 she "violat[ed] departmental policy in her handling of an incident involving her nephew fighting at a local basketball court"; she was "investigated for a citizen complaint levied against her for being 'rude and discourteous' when visiting the citizen's home in response to a call that the citizen's daughter had run away from home"; and she was "the subject of an internal affairs investigation following her involvement in a domestic dispute with her husband." *Id.* at 2–3. Following the domestic dispute,

which occurred in 2003, Stevenson was arrested and charged with battery and disorderly conduct. "While the battery charge was ultimately dropped, it was determined that [Stevenson] violated departmental policy requiring all employees to adhere to all federal, state, and local laws and ordinances." *Id.* at 3.

Sean Visners, another officer who helped oversee the FTO program and assisted Castro in identifying which FTOs to assign trainees during some of the time Stevenson was seeking FTO trainees, identified four specific incidents that occurred after her FTO training and that raised concerns about Stevenson's fitness to train. These incidents—one in May 2017, one in September 2017, and two in November 2017—occurred alongside Stevenson's complaints of discrimination, so we discuss them in their context.

In May 2017, a local school's director complained about Stevenson, who had a duty assignment there. "Parents had complained that [Stevenson] was not properly directing traffic and that they overheard [Stevenson] describing the school's parents as difficult and complainers." Doc. 40-4 at 3. Stevenson was removed from detail at the school.

Beginning in June 2017, other FTOs from Stevenson's certification class were assigned trainees, but she was not. Some of those officers had disciplinary histories. Paul Hormann, a white male, had one sustained charge based on a traffic accident. Christian Coello, a Hispanic male, had one sustained charge based on a traffic accident and one based on accidental discharge of his taser. Tiffany Yeung, an Asian American/Pacific Islander female, had one

sustained charge from a previous role with the City as a dispatcher, before she became a police officer. [3]

In August, Stevenson told Patrizi she believed she was not assigned FTO trainees because she was a Black woman; Patrizi told her he would "look into it." Doc. 46-5 at 17. When she inquired in September why she had not been assigned trainees, Visners told her that she "did not meet a traffic stop quota." Doc. 46-1 at 2. Stevenson "had never been informed of any such requirement for FTO assignment, and no other FTOs [told her] that they were subject to any such quota." *Id.*

The second incident to which Visners referred also occurred in September 2017. Stevenson "was dispatched to a disturbance involving a weapon. Only after she was dispatched to the call did [Stevenson] advise on the main channel that she was '10-6 personal,' which means 'busy for personal reasons,'" including a bathroom break. Doc. 40-4 at 4. After another officer responded to the disturbance, Stevenson was ordered back to the police department; there, Visners and other on-duty sergeants yelled at Stevenson and accused her of being at home while she was supposed to be on duty. Stevenson "stated that she had a medical condition that caused her to use the bathroom frequently and felt having to constantly advise that she was 10-6 personal was insensitive and

---

[3] The racial designations in this paragraph were assigned by the City in its answers to Stevenson's interrogatories.

degrading." Doc. 40-13 at 1; *see* Doc. 46-5 at 26 (Stevenson testifying she "believe[d]" she told Stevenson that she had "a woman issue").

Visners referred Stevenson to the personnel department and asked her to "discuss the matter with the personnel director," who "would notify [the] department if there was something [it] needed to do to accommodate her condition." Doc. 40-13 at 1–2. Visners told Stevenson, "For now you need to get on the radio and you need to advise every time you're gonna leave your zone and go to the bathroom." Doc. 46-5 at 25. Visners "advised [Stevenson] that she needed to announce that she was '10-6 personal' at the time she became unavailable rather than announce her unavailability after-the-fact," so that an available officer could properly respond to the call. Doc. 40-4 at 4. Visners explained that the "10-6 personal" announcement rule was "a uniform policy in place for all City police officers," that no detail beyond the announcement is required, and that he "never told [Stevenson] that she had to announce" her personal unavailability "when she was on her menstrual cycle or any other private matter." *Id.*

Stevenson "told [Visners] that [she] felt like . . . they were discriminating against" her because she was a woman. Doc. 46-5 at 25. According to Stevenson, other officers were not required to report their whereabouts "at all times" the way she was. Doc. 46-1 at 2. She went to the City's personnel department, where she was advised that menstrual cycle needs were "not a[] [Human Resources] issue." Doc. 46-5 at 27.

The last two incidents to which Visners referred occurred in November 2017. Stevenson "was assigned to a zone that would have made her the closest available unit to handle a 911 call involving a dog being shot." Doc. 40-4 at 4. Visners never heard Stevenson respond to the call, so he inquired about her status and, when she said she was unaware of the call, ordered her to respond to it. *Id.* Minutes after Stevenson told Visners she was on her way to handle the call, "another unit cleared the zone and handled the written incident report." *Id.* Stevenson "never . . . contacted the officers who cleared the location to inquire anything about the call." *Id.* This made Visners concerned about Stevenson's "lackadaisical approach, her non-responsive nature, and her ability to perform her job duties in an acceptable manner." *Id.* at 5. Patrizi spoke to Stevenson about the incident; Stevenson "expressed that she felt that she was being picked on," that she believed she was "being targeted because she is a black female," and that having to advise that she was 10-6 on the radio "was degrading." Doc. 40-13 at 2. She told Patrizi that she had spoken to the personnel department about her medical condition that necessitated frequent trips to the bathroom. Patrizi told Stevenson that "people were complaining that [she] w[as]n't pulling [her] weight." Doc. 46-5 at 29.

Two days later, on November 16, Stevenson attended a department briefing at which she asked her fellow officers if they felt she was not "[p]ulling her weight." Doc. 40-13 at 3. When an officer brought up the incident from two days prior, Stevenson "abruptly got up and walked out of the briefing." *Id.* Stevenson went to her

patrol car; when officers found her, she was crying, voluntarily relinquished her gun belt to a fellow officer, and requested the assistance of fire rescue. Stevenson was "transported to a local hospital and diagnosed with anxiety." Doc. 40-4 at 5.

Visners informed then-Chief of Police John Brooks of these incidents, and Brooks ordered that Stevenson be placed on administrative leave and undergo a fitness-for-duty evaluation. Brooks testified that he never made any decision, disciplinary or otherwise, about Stevenson's employment based on race or sex, or in retaliation for her engagement in any protected activity.

Two days after she was placed on administrative leave, Stevenson filed a Charge of Discrimination with the Florida Commission on Human Relations. Stevenson charged that she was being denied FTO trainees because of her race and sex and listed November 16, 2017 as the date of most recent or continuing discrimination. As a result of the Charge of Discrimination, the City conducted an internal affairs investigation. After interviewing Stevenson, Visners, Patrizi, Castro, and numerous others, as well as reviewing extensive documentary evidence, the investigator was "unable to substantiate any of Stevenson's claims" of discrimination and exonerated Stevenson's supervisors of the charges of discrimination. Doc. 46-4 at 79, 96.

In January 2018, Stevenson returned to duty "in the same capacity as before" she was placed on administrative leave. Doc. 40-4 at 5.

In June 2018, Stevenson was involved with another incident that resulted in another internal affairs investigation. Stevenson, along with other officers, responded to a scene involving two individuals "suspected to be armed and possess narcotics." Doc. 40-5 at 2. "As her fellow City police officers attempted to detain the suspects, [Stevenson] was alleged to have attempted to remove these officers from the suspects and verbally exclaim that the officers were using too much force." *Id.* The "detailed internal affairs investigation," which involved interviewing Stevenson and 15 other witnesses, plus reviewing security footage, sustained "the allegation that [Stevenson] failed to take appropriate action to aid another department member, or law enforcement officer, exposed to impending harm." *Id.*[4] Stevenson was suspended for 16 hours without pay and received 4 hours of Use of Force Remedial Training. Yet, according to Chief of Police Anthony Rosa, Stevenson's "pay has never been decreased, she has never lost any employment benefits associated with her position, and her job duties have at all times remained the same." *Id.* at 2–3.

In September 2018, Patrizi completed another performance evaluation (for the period spanning May 2017 through May 2018) in which he rated Stevenson's performance "satisfactory." Doc. 40-

---

[4] Stevenson testified generally that this disciplinary action "was not investigated." Doc. 46-1 at 3; *see* Doc. 46-5 at 9 (same). This is plainly belied by the record, which documents extensive investigation. And it is belied by her own testimony: she explained that she and the other arresting officers gave statements during the course of the investigation. Doc. 46-5 at 9.

7 at 2. In his opinion, Stevenson "merely met the minimum shift standards" and "by no means went above and beyond of what was required of her." *Id.* He "noticed a pattern of [Stevenson] not being efficient in her work and spoke to her about this." *Id.* He also noted that Stevenson "displayed a poor and guarded attitude at times." *Id.* At the time he evaluated Stevenson in September 2018, Patrizi was unaware of her November 2017 Charge of Discrimination.

Stevenson filed a second Charge of Discrimination on November 28, 2018. This time, she alleged that she was retaliated against "due to her complaints against her employer" in the form of a "satisfactory" annual review for the period of May 2017 through May 2018. Doc. 40-18 at 1. She alleged that the "satisfactory" rating was "proof of the City's continued retaliation . . . and its discriminatory practice to prevent her, a Black female, from participating as an FTO." *Id.* at 2. She referred to the June/July 2018 internal affairs investigation as "bogus" and also characterized her November 2017 administrative leave as retaliatory. *Id.*

After she was issued a right-to-sue letter, Stevenson filed this action against the City, alleging that the City had discriminated against her on the basis of her race and sex and that it retaliated against her for engaging in protected activity, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and

the Florida Civil Rights Act of 1992, Fla. Stat. § 760.10 *et seq.*[5] In a second amended complaint, she alleged that the City discriminated against her on account of her race and gender in that it failed to assign her FTO trainees and singled her out for taking bathroom breaks, including by requiring her to report breaks. Stevenson did not allege that the City had any legitimate reason for the actions of which she complained. She further alleged that when she complained to her supervisors about the discriminatory treatment, "she was harassed, passed over for FTO assignments[,] and suspended" in retaliation. Doc. 31 at 12.

At the close of discovery, the City moved for summary judgment. The district court granted the City's motion. The district court applied a single-motive theory to Stevenson's discrimination claims because she never identified any legitimate reasons the City had for not assigning her trainees, and although her second amended complaint alleged that her race and sex were "motivating factor[s]," these were only passing references to a "mixed-motive" theory and insufficient to raise the issue. With respect to her FTO assignment discrimination claims, the court determined that Stevenson made out a prima facie case, but that the City had proffered legitimate reasons for its decision not to assign her any trainees.

---

[5] Claims under the Florida Civil Rights Act are analyzed under the same framework as those brought under Title VII. *See Jones v. United Space Alliance, LLC*, 494 F.3d 1306, 1310 (11th Cir. 2007). We refer primarily to Title VII here with the understanding that its analysis applies to Stevenson's state-law claim.

The court concluded that Stevenson failed to rebut the City's evidence or show pretext.

With respect to her discrimination claims based on reporting bathroom breaks, the district court determined that Stevenson failed to make out a prima facie case because the undisputed evidence showed that every officer was required to announce a "10-6 personal" code when applicable.

The district court also rejected Stevenson's retaliation claims. Stevenson had identified three alleged adverse actions: (1) her failure to receive FTO trainees, (2) her November 2017 administrative leave, and (3) her "satisfactory" May 2017 through May 2018 performance evaluation. As to the first, the district court rejected Stevenson's claim for the same reason it rejected her discrimination claim; that is, Stevenson had failed to prove that the City's proffered reasons were pretextual. As to the second, the district court found that Stevenson presented no evidence that the City placed her on administrative leave because of her complaints. Rather, the court found, all the evidence showed that the City suspended her because of her anxiety attack during the staff meeting. As to the third, the court concluded that Stevenson failed to make out the elements of a prima facie case of retaliation because the temporal connection between her September 2018 performance evaluation and November 2017 Charge of Discrimination was too attenuated and, in any event, Patrizi testified that he did not know of the Charge when he evaluated Stevenson for her 2017–2018 review. In granting summary judgment to the City, the court did not

expressly address Stevenson's retaliation claim based on being required to announce bathroom breaks.

This is Stevenson's appeal.

## II.

We review *de novo* the district court's grant of summary judgment, drawing all inferences and reviewing all evidence in the light most favorable to the non-moving party. *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party may meet this standard by demonstrating a lack of evidence supporting the essential elements of the non-moving party's claims. *Moton*, 631 F.3d at 1341.

## III.

Stevenson argues that the district court made several errors in granting the City's motion for summary judgment. Her primary arguments are that the court (1) failed to apply the test for mixed-motive discrimination cases, (2) erred in its single-motive discrimination analysis, and (3) erred in rejecting her retaliation claims. We address these arguments in turn.

### A. Stevenson's Discrimination Claims

#### 1. Single-Motive Framework Applies

Stevenson argues that the district court applied the wrong legal standard because she brought "mixed-motive" discrimination claims, but the district court applied a single-motive framework. She explains that she proffered evidence of the City's discriminatory motives, and the City purported to offer evidence of legitimate reasons for its decisions regarding her employment. Thus, she says, this case must be analyzed under the mixed-motive employment-discrimination standard. We disagree.

Under Title VII, covered private employers are barred from discriminating against their employees "because of" their race or sex. 42 U.S.C. § 2000e-2(a). Title VII also prohibits discriminatory actions taken against an employee where the employee's race or sex was "a motivating factor." 42 U.S.C. § 2000e-2(m). Thus, there are two different legal theories under which a plaintiff can proceed in employment discrimination cases. *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016).

A plaintiff asserting a single-motive discrimination claim, under § 2000e-2(a), can survive a motion for summary judgment by showing that illegal bias was the *only* reason for the adverse action. *See* 42 U.S.C. § 2000e-2(a); *see Quigg*, 814 F.3d at 1235. In reviewing single-motive claims, courts often use the standard established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* burden-shifting framework, "the

plaintiff must first create an inference of discrimination through [her] prima facie case." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767–68 (11th Cir. 2005). To establish a prima facie case, a plaintiff must show that (1) she belongs to a protected class, (2) she was qualified to do the job, (3) she was subjected to an adverse employment action, and (4) her employer treated similarly situated employees outside her protected class more favorably. *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1273 n.1 (11th Cir. 2021). "Once the plaintiff has made out the elements of the prima facie case, the burden shifts to the employer to articulate a non-discriminatory basis for its employment action." *Vessels*, 408 F.3d at 767–68. "If the employer meets this burden, the inference of discrimination drops out of the case entirely, and the plaintiff has the opportunity to show by a preponderance of the evidence that the proffered reasons were pretextual." *Id.* at 768.[6]

Alternatively, a plaintiff can assert a "mixed-motive" claim, under § 2000e-2(m), and avoid summary judgment by showing that, while an employer was motivated by more than one reason to take a particular action, a protected characteristic was *a* motivating factor for the defendant's adverse employment action. *See*

---

[6] "[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.*

42 U.S.C. § 2000e-2(m); *Quigg*, 814 F.3d at 1239. In *Quigg*, we held that the *McDonnell Douglas* framework was not the appropriate standard for resolving whether mixed-motive claims could survive summary judgment. *Quigg*, 814 F.3d at 1238. We noted that *McDonnell Douglas* requires a plaintiff to prove that the "true reason" for an adverse action was illegal, and this requirement necessarily obliges the plaintiff to prove that her employer was never motivated by a legitimate reason. *Id.* at 1237–38. Thus, we reasoned that *McDonnell Douglas* was incongruent with mixed-motive claims under 42 U.S.C. § 2000e-2(m), which was designed to protect employees from employers who are motivated, in part, by discrimination. *Id.*[7]

Stevenson argues that she raised a mixed-motive claim in her complaint, where she alleged that her race and sex were "motivating factor[s]" in the City's decisionmaking. Doc. 31 at 7, 10. Given that she never alleged a legitimate reason for the City's actions, however, and considering that she alleged she was discriminated against for two unlawful reasons (race and sex), it is not at all apparent that these passing references intended to refer to a mixed-motive claim rather than to acknowledge the multiple claims she

---

[7] The "mixed-motive" standard does not apply in Title VII retaliation claims. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.").

was raising. We agree with the district court that, under the circumstances of this case, these references in Stevenson's complaint were insufficient to raise a mixed-motive claim.

Stevenson argues that the district court nonetheless should have applied a mixed-motive framework. She contends that because the City "asserted that it had legitimate reasons for treating [her] differently, and it has purported to offer evidence of the legitimate reasons," Appellant's Br. at 18–19, the district court was required to evaluate her claims under the mixed-motive standard. If true, this would turn *every* Title VII discrimination claim into a mixed-motive case because the employer must always offer a legitimate reason for the actions it takes. A single-motive case is not transformed into a mixed-motive case merely because an employer satisfies its burden of proof. We reject Stevenson's argument to the contrary.

### 2. *Single-Motive Analysis*

Having concluded that the district court rightly applied the single-motive framework for Stevenson's discrimination claims, we address Stevenson's arguments that the court erred in its application of this framework. Stevenson argues that the district court erred in concluding that she failed to establish a prima facie case as to her claim that she was required to announce bathroom breaks, and that she failed to demonstrate the City's proffered reasons for denying her FTO trainees were pretextual. We reject both of these arguments.

20-12530                Opinion of the Court                19

### a.  Bathroom Breaks

As we explained above, the district court concluded that Stevenson had failed to show that she was treated differently from anyone outside her protected classes.[8] Stevenson challenges this ruling, acknowledging that "there was a procedure where officers could state a code to indicate that they were taking a personal break," but arguing that only she "was required to verbalize her reason for taking such a break and her whereabouts." Appellant's Br. at 24–25. There is no evidence in the record, however, that she was required to verbalize her reason for announcing that she was 10-6 personal. Rather, Visners testified that the 10-6 personal rule, which was "a uniform policy in place for all City police officers," required no detail beyond the announcement. Doc. 40-4 at 4. Stevenson testified that she was asked why she announced 10-6 personal *after* she was unavailable by radio in a September 2017 incident, but that fact does not give rise to an inference that she was required to verbalize the reason for all 10-6 personal breaks. There

---

[8] We reject Stevenson's argument that the district court erred in ruling on her claims regarding bathroom breaks because the City did not make any argument about the 10-6 personal rule in its motion for summary judgment. *See Massey v. Cong. Life. Ins. Co.*, 116 F.3d 1414, 1417 (11th Cir. 1997) ("District courts unquestionably possess the power to trigger summary judgment on their own initiative."); *Artistic Ent., Inc. v. City of Warner Robins*, 331 F.3d 1196, 1202 (11th Cir. 2003) (affirming the *sua sponte* grant of summary judgment where "the district court had all the information necessary to rule on the legal issues, and [the plaintiff] raised no genuine issue of material fact that would have precluded summary judgment").

also is no evidence in the record that she was required to announce her whereabouts. Again, there is evidence in the record that Stevenson was required to announce 10-6 personal when she "le[ft] [her] zone" to go to the bathroom, Doc. 46-5 at 25, but this fact does not give rise to an inference that she was required to announce where she was taking her break. For these reasons, the district court did not err by granting summary judgment on her bathroom break-based discrimination claim.

### b. FTO Trainees

Again, Stevenson challenges the district court's determination that she failed as a matter of law to demonstrate that the City's stated reasons for declining to assign her FTO trainees was pretext for discrimination. To show pretext, a plaintiff must show "*both* that the [employer's] reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original). Specifically, a plaintiff must rebut an employer's reason "head on" and "cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). A plaintiff cannot merely make conclusory allegations and assertions of pretext but must present specific facts demonstrating it. *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009). When an employer offers multiple reasons for its action, to avoid summary judgment the plaintiff must show that each reason was pretextual. *Chapman*, 229 F.3d at 1037.

The City presented undisputed evidence that Stevenson's conduct had raised concerns among her colleagues and supervisors, that she had been the subject of multiple internal affairs investigations, that she had used a lot of sick leave, and that her performance evaluations for the relevant time period were disqualifying. Stevenson has failed to show that each of these reasons was pretextual. *See id.*

Stevenson makes several arguments why the district court erred in rejecting her arguments about pretext, but none holds water. She argues that the reason she was given for her failure to receive FTO trainees, her lack of traffic stops, was false; thus, she says, she has shown pretext. We have granted that evidence contradicting an employer's proffered legitimate, nondiscriminatory reason "is highly suggestive of pretext." *Flowers v. Troup Cnty, Ga., Sch. Dist.*, 803 F.3d 1327, 1339 (11th Cir. 2015). We have explained, however, that the contradiction, alone, is insufficient to permit a plaintiff to survive a motion for summary judgment. *Id.* "Allowing the plaintiff to survive summary judgment would be inappropriate, for example, if the record conclusively revealed some other, nondiscriminatory reason" for the plaintiff's termination. *Id.* (internal quotation marks omitted). Here, the City's proffered reasons and the reason Visners gave Stevenson in September 2017 were nondiscriminatory. So even assuming Stevenson had demonstrated that the reasons were contradictory (and the traffic quota reason false), that showing alone would not satisfy Stevenson's burden to establish pretext. Stevenson makes essentially five other

arguments in support of pretext, but none convinces us that she has met her burden.

First, Stevenson argues that the City "presented no documentary evidence that the officers who testified in the declarations were the decision makers for FTO trainees." Appellant's Br. at 27. Such *documentary* evidence was not required. It is undisputed from the existing record evidence—namely, the declarations and depositions of Castro, Visners, and Katz—that they were the decisionmakers. Stevenson cannot create a genuine issue of material fact merely by asserting that someone else may have been the decisionmaker. She must produce evidence, and she did not.

Second, and similarly, Stevenson argues that the City "presented no documentary evidence that Stevenson's disciplinary history was used to decide not to train assignees to her." *Id.* The City presented ample testimonial evidence to that end, and that is all we require.

Third, Stevenson asserts that "all evidence shows" that she was "qualified and enrolled as an FTO, which was all the eligibility that was needed for a trainee assignment." *Id.* She contends that the City "violated its own policies" when it failed to assign her trainees. *Id.* at 28. Not so. In fact, the undisputed evidence demonstrates that officers who completed FTO training were not automatically entitled to be assigned trainees, and that assignment of trainees was left to the discretion of the officers overseeing the FTO program.

Fourth, Stevenson cites the fact that several of the non-Black and male officers who received FTO trainees had disciplinary histories. A plaintiff may provide evidence of pretext via comparators "whose more-favorable treatment could support a reasonable jury's inference that the [defendant's] decision to fire [the plaintiff] was pretext for race discrimination." *Flowers*, 803 F.3d at 1339. To give rise to such an inference, however, Stevenson must show that she and her proffered comparators were "similarly situated in all material respects," including their disciplinary histories. *Lewis v. City of Union City*, 918 F.3d 1213, 1218 (11th Cir. 2019) (en banc). Stevenson has not shown that she was "similarly situated in all material respects," including her disciplinary history, to these other FTOs, so they do not support her pretext argument.

Fifth, and finally, Stevenson challenges one of the City's proffered legitimate reasons for failing to assign her trainees—her apparently apathetic attitude at work—as being based on "inadmissible hearsay." Appellant's Br. at 29. This argument, too, fails to persuade us. A district court may consider hearsay evidence at summary judgment so long at that evidence can be reduced to admissible evidence at trial. *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). Here, the evidence Stevenson challenges was based on observations of her colleagues. Some provided declarations explaining their personal knowledge, which is not hearsay at all. For the observations that were hearsay, those were based on reports by Stevenson's fellow officers, and presumably those officers could have been called to testify at trial. Thus, the district court was

entitled to consider the evidence. More fundamentally, even if Stevenson can demonstrate that one of the City's proffered reasons was illegitimate, she has not met her burden to show they all are. *Chapman*, 229 F.3d at 1037.

For these reasons, the district court correctly granted the City summary judgment on Stevenson's race and sex discrimination claims.

## B.  Stevenson's Retaliation Claims

Stevenson asserts that the district court erred by rejecting her retaliation claims, which were based on her failure to receive FTO trainees, her 2017–2018 "satisfactory" employee evaluation, and the requirement that she announce when she was 10-6 personal.[9] After reviewing Title VII retaliation principles, we address these challenges in turn.

Title VII's retaliation provision makes it unlawful for an employer to retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Title VII retaliation

---

[9] The district court also rejected Stevenson's claim that she suffered a "retaliatory environment," akin to harassment or a hostile work environment, because she relied only on conclusory allegations. Stevenson abandoned this issue by not raising it in her brief on appeal. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).

claims are analyzed under the framework established in *McDonnell Douglas*, whereby a plaintiff must first establish a prima facie case, after which the burden shifts to the employer to come forward with a legitimate reason for the employment action. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162–63 (11th Cir. 1993).

A plaintiff may establish a prima facie retaliation case by showing that (1) she was engaged in statutorily protected activity, (2) she suffered a materially adverse action, and (3) there was a causal connection between the two events. *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). To prove causation, an employee must show that the decisionmakers were aware of the protected conduct. *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002).

If the plaintiff establishes the elements of a prima facie case, then the employer has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action as an affirmative defense to liability. *Goldsmith*, 513 F.3d at 1277. The plaintiff bears the ultimate burden of proving retaliation by a preponderance of the evidence. *Id.* Where a plaintiff fails to show pretext as to a discrimination claim, "that conclusion applies with equal force to [that plaintiff's] retaliation claim" based on the same employer conduct. *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1293 (11th Cir. 2018).

Stevenson first argues that the City's failure to assign her FTO trainees after she filed her Charge of Discrimination was

retaliatory. As we explained above in the context of her discrimination claims, however, Stevenson failed as a matter of law to demonstrate that the City's asserted legitimate reasons for deciding not to assign her FTO trainees were pretextual. That failure dooms Stevenson's retaliation claim, which is based on the same conduct. *Id.*

Second, Stevenson argues that the district court erred in deeming her 2017–2018 "satisfactory" performance evaluation, completed in September 2018, to be too temporally removed from her November 2017 Charge of Discrimination regarding not being assigned FTO trainees to permit an inference of retaliation.[10] She says that the relative temporal proximity (10 months), plus the "subject matter relation" between her complaints and the evaluations (which, in turn, kept her from being eligible for trainees) was sufficient for a jury to conclude that the evaluation was retaliatory. Appellant's Br. at 35. Stevenson overlooks that she has presented no evidence that Patrizi knew she had complained of discrimination. Indeed, Patrizi testified that he did *not* know of her November 2017 Charge of Discrimination when he conducted the performance evaluation in September 2018. Thus, as a matter of law

---

[10] In a subheading, Stevenson argues that "[t]he lowered evaluations *and suspension*" she received "after she complained of discrimination were retaliatory." Appellant's Br. at 33 (emphasis added). Nowhere in this section or any other section does Stevenson provide substantive argument about her November 2017 administrative leave, which she calls a suspension. Stevenson did not "plainly and prominently" raise the issue on appeal; thus, we do not address it. *Sapuppo*, 739 F.3d at 681 (internal quotation marks omitted).

Stevenson did not demonstrate causation. *See Shannon*, 292 F.3d at 716.

Third, as regards the requirement that she announce when she was 10-6 personal, recall that the district court did not expressly address Stevenson's claim but nonetheless granted the City summary judgment on all claims. On appeal Stevenson argues that the district court erred in failing to account for the ways in which the 10-6 personal rule was enforced against her—by requiring her "to verbally articulate why she was taking a personal break, and where she was going." Appellant's Br. at 33. But as we explained in the context of her discrimination claim, Stevenson's premise that she was subject to a unique rule is faulty. Thus, she cannot demonstrate that she suffered any material adverse action.

The district court did not err in granting summary judgment to the City on Stevenson's retaliation claims.

## IV.

For the foregoing reasons, we affirm the district court's judgment in favor of the City.

**AFFIRMED.**